### In re RAY ELLISON GRANDCHILDREN TRUST.

No. 04–06–00704–CV.

Court of Appeals of Texas, San Antonio.

April 2, 2008.

David E. Keltner, Kelly Hart & Hallman LLP, Fort Worth, TX, Frank N. Ikard, Jr., Mary E. Haught, Ikard & Golden, P.C., Austin, TX, for Appellant.

Charles M. Hornberger, David Jed Williams, T. Drew Cauthorn, Hornberger Sheehan Fuller & Beiter Incorporated, Sara Murray, Joyce W. Moore, David S. Gragg, Langley & Banack, Inc., Rudy A. Garza, Garza & Lazor, P.C., Ellen B. Mitchell, Allan Paterson, Gardner S. Kendrick, Cox Smith Matthews Inc., San Antonio, Mike A. Hatchell, Locke Ford Bissell & Liddell, Austin, TX, for Appellee.

Margaret Corning Boldrick, Patricia F. Sitchler, Schoenbaum, Curphy & Scanlan, Kevin P. Kennedy, TX, San Antonio, for ad litem.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, REBECCA SIMMONS, Justice.

## OPINION

KAREN ANGELINI, Justice.

At issue in this appeal is whether, in creating an inter vivos, irrevocable trust

for the "descendants" of his children, Ray Ellison Sr. intended to include, as beneficiaries, his son's adopted children, who were not adopted until they were adults. Because we conclude that Ray Ellison Sr. did not intend to include persons adopted as adults by his son, we affirm the summary judgment granted by the trial court.

## BACKGROUND

On March 9, 1982, Ray Ellison Sr. created an inter vivos, irrevocable trust called "the Ray Ellison Grandchildren Trust." At the time the Trust was created, Ray Ellison Sr. had two adult children: Bonnie Ellison (then age 36) and Ray Ellison Jr. (then age 40). Bonnie Ellison had one daughter, Tracy Egan (now Tracy Egan Calloway) (then age 11). Ray Ellison Jr. had two daughters: Arleene Ellison (then age 18) and Darleene Ellison (then age 20).

The pertinent language of the Trust provides the following:

At the time of executing this trust instrument, the beneficiaries are well provided for by their parents. It is the desire of the Grantor that the income of this trust be accumulated and that the properties from time to time put into the trust shall be invested.... Any distributions for beneficiaries of this trust prior to the termination of the trust shall be solely in the discretion of the Trustees. However, the Grantor realizes that there may be circumstances arising in the future which would make it desirable or advisable on the part of the Trustees to make distributions from this trust prior to the time it terminates. Therefore, the Trustees are authorized *to pay to or for the benefit of the descendants* of BONNIE JEAN EGAN and the descendants of RAY ELLISON JR. (the descendants living at this time are TRACY EGAN, DARLENE ELLISON AND ARLENE ELLISON[1]) out of income,

and if income is insufficient, out of the principal of this trust, from time to time such sums as are reasonably needed for their health, including medical, dental, hospital and nursing expenses and expenses of invalidism, and such sums as are reasonably needed for their maintenance and support. There shall be no requirement that the same amount be paid for each of such persons. In determining the amount to be paid to or for the benefit of each of such persons, the Trustees shall take into consideration such other income or means of support known to the Trustees that each of them is entitled to receive....

This trust shall terminate upon the 31st day of December, in the year 2020, and upon termination, the funds and properties remaining in the trust after paying the expenses of the trust shall be distributed as follows:

A. FIFTY PERCENT (50%) to the descendants of BONNIE JEAN EGAN, per stirpes, and if there be none, to the descendants of RAY ELLISON, JR., per stirpes.

B. FIFTY PERCENT (50%) to the descendants of RAY ELLISON, JR., per stirpes, and if there be none, to the descendants of BONNIE JEAN EGAN, per stirpes.

In the event the above named persons are all deceased and none of them have left living descendants, the funds and properties remaining in the trust shall be distributed to one or more charitable organizations in which contributions are then deductible under sections 642(c) and 2055(e) of the Internal Revenue Code of 1954 in such shares as the Trustees may designate.

(emphasis added).

In 1989, Ray Ellison Jr. divorced his first wife, to whom he had been married

---

1. Darleene's and Arleene's names are incorrectly spelled in the trust document.

for thirty-two years. In 1995, he remarried.

In 1998, sixteen years after the Trust was created, Ray Ellison Jr.'s father, Ray Ellison Sr., was found to be incapacitated by a probate court in Bexar County.[2] Ray Ellison Jr.'s sister, Bonnie Ellison, was designated by the probate court as Guardian of Ray Ellison Sr.'s Person, and Frost National Bank was appointed Guardian of his Estate.

In 2003, twenty-one years after the Trust was created, Ray Ellison Jr. adopted the adult children of his second wife: Aaron Lindner (then age 39), Jeffrey Lindner (then age 37), and Marc Lindner (then age 36) ("the Lindners"). Immediately after their adoption, the Lindners moved for an accounting of the Trust. The Trustees, however, refused to provide an accounting and filed a declaratory judgment action requesting that the probate court "determine whether the Lindners are beneficiaries of the Trust and therefore entitled to an accounting." In response, the Lindners filed an answer and counterclaim for declaratory judgment, requesting that the court declare them beneficiaries of the Trust.

Darleene and Arleene Ellison then joined the lawsuit and filed an answer to the Trustee's original petition for declaratory judgment and an answer to the Lindners' counterclaim for declaratory judgment. They also filed their own original counterclaim for declaratory judgment. They alleged that their father's adoption of the Lindners was a "sham designed by" their father and the Lindners in an attempt to give the Lindners standing to make claims against the Trust, based on their contention that they are now "descendants" of their father. They also alleged that their grandfather did not intend

for the term "descendants" to include any person adopted as an adult when he executed the Trust on March 9, 1982. Therefore, they requested the trial court declare that the term "descendant" as used in the Trust does not include those persons adopted as an adult and, specifically, does not include the Lindners. In their second amended answer, Arleene and Darleene Ellison also pled affirmative defenses. They alleged that the Lindners are "equitably estopped from claiming to be beneficiaries of the Trust as a result of their participation in and/or attempt to benefit from the wrongful use of the adult adoption statute to divert Trust assets to individuals who would otherwise have no colorable claim or right to those assets." They alleged that the Lindners did not come to the court with "clean hands" and that their "claims to be beneficiaries of the Trust are barred because it is contrary to public policy of Texas for persons to use the adult adoption statutes to divert Trust assets to individuals who would otherwise have no colorable claim or right to those assets."

Tracy Egan Calloway also joined the litigation and filed an answer to the original petition for declaratory judgment and answer to the Lindners' counterclaim for declaratory judgment, bringing the affirmative defenses of fraud, constructive fraud, illegality, and estoppel as well as the equitable defense of unclean hands.

The Lindners then moved for partial summary judgment, arguing that they are beneficiaries of the Trust as a matter of law. Arleene and Darleene Ellison responded by filing a cross-motion for partial summary judgment, arguing that the Lindners are not beneficiaries of the Trust as a matter of law.

The trial court denied the Lindners' motion and granted Arleene and Darleene

2. Ray Ellison Sr. died on October 16, 2005.

Ellisons' motion. In its order, the trial court determined as a matter of law the following:

(1) the particular language in the March 9, 1982, Ray Ellison Grandchildren Trust [that] identifies or refers to the Trust beneficiaries as "descendants of BONNIE JEAN EGAN" and "the descendants of RAY ELLISON JR." does not include any person whom Bonnie Jean Egan or Ray Ellison Jr. has adopted, or may in the future adopt, if such adopted person was or is an adult, over the age of majority under Texas law, at the time of said adoption;

(2) such trust language specifically does not include Aaron Lee Lindner, Jeffrey Scott Lindner, and Marc Tecelle Lindner ("the Lindners"); and

(3) the Lindners are not Trust beneficiaries and are not entitled to an accounting pursuant to TEXAS TRUST CODE §§ 113.151, 113.152.

Although the trial court denied the Lindners' motion for partial summary judgment, it did grant their motion to exclude certain summary judgment evidence submitted by Darleene and Arleene Ellison. Specifically, the trial court excluded Ronald Habitzreiter's affidavit and any extrinsic evidence of the intent of Ray Ellison Sr. when executing the Trust.

Also in its order, the trial court noted that the only remaining issues were those related to attorneys' fees, expenses, and costs. The Trustees, Darleene and Arleene Ellison, Tracy Egan Calloway, and the Lindners all moved for attorneys' fees, expenses, and costs. In its final judgment, the trial court granted all these motions and ordered the parties' attorneys' fees to be paid from the Trust.

The Lindners have appealed the trial court's determination that they are not beneficiaries of the Trust. The Trustees have appealed the trial court's award of attorneys' fees, costs, and expenses to the Lindners. And, Tracy Egan Calloway brings a cross-issue, arguing that in the event we reverse the trial court's order, we should not reverse and render judgment in favor of the Lindners because they did not negate her affirmative defenses of fraud, constructive fraud, illegality, and estoppel as well as the equitable defense of unclean hands.

### DECLARATORY JUDGMENT/SUMMARY JUDGMENT

#### A. Standard of Review

We review a declaratory judgment under the same standards as other judgments and decrees. TEX. CIV. PRAC. & REM. CODE ANN. § 37.010 (Vernon 1997). When both parties move for summary judgment and the trial court grants one motion and not the other, we review both parties' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 605 (Tex.2002).

A party moving for summary judgment must show that no genuine issue of material fact exists and that the party is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). Here, both motions for summary judgment were based on a question of law. *See Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex.App.-Fort Worth 2003, pet. denied) (explaining that the construction of a trust instrument is a question of law for the trial court); *Hurley v. Moody Nat'l Bank*, 98 S.W.3d 307, 310 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (same). Thus, our standard of review is de novo.

## B. Rules of Construction

■■■■ The same rules of construction apply to both wills and trusts. *See Eckels,* 111 S.W.3d at 694; *Hurley,* 98 S.W.3d at 310. In interpreting a will or a trust, we ascertain the intent of the testator or grantor. *See Eckels,* 111 S.W.3d at 694; *Hurley,* 98 S.W.3d at 310. We do so from the language used within the four corners of the instrument. *Eckels,* 111 S.W.3d at 694; *see Shriner's Hosp. v. Stahl,* 610 S.W.2d 147, 151 (Tex.1980) (applying four-corners rule to construe a will). If this language is unambiguous and expresses the intent of the grantor, we need not construe the trust instrument because "it speaks for itself." *Eckels,* 111 S.W.3d at 694; *Hurley,* 98 S.W.3d at 310; *see Frost Nat'l Bank v. Newton,* 554 S.W.2d 149, 153 (Tex.1977) (" 'No speculation or conjecture regarding the intent of the testatrix is permissible where, as here, the will is unambiguous, and we must construe the will based on the express language used therein.' "). Thus, we do not focus on what the grantor intended to write but the meaning of the words he actually used. *San Antonio Area Found. v. Lang,* 35 S.W.3d 636, 639 (Tex.2000). That is, we must not redraft a trust instrument to vary or add provisions "under the guise of construction of the language" of the trust to reach a presumed intent. *Id.*

■■■■ In determining the grantor's intent from the four corners of the trust instrument, we carefully examine the words used and, if unambiguous, do not go beyond specific terms in search of the grantor's intent. *Id.* Thus, when the language of a trust instrument is unambiguous, extrinsic evidence may not be introduced to show that the grantor intended something outside of the words used. *Id.* And, when the intent of the grantor is unambiguous, his intent controls even if it conflicts with applicable statutes. *See*

*Vaughn v. Vaughn,* 161 Tex. 104, 337 S.W.2d 793, 796 (1960) (explaining that statutes "may be considered as an aid to the construction of a will" but "cannot control or defeat a will's true construction").

■■■■ If, on the other hand, the meaning of the instrument is uncertain or "reasonably susceptible to more than one meaning," the instrument is ambiguous. *Eckels,* 111 S.W.3d at 694 (quoting *Myrick v. Moody,* 802 S.W.2d 735, 738 (Tex.App.-Houston [14th Dist.] 1990, writ denied)). Ambiguity can be either patent or latent. *Eckels,* 111 S.W.3d at 695; *see In re Estate of Brown,* 922 S.W.2d 605, 608–09 (Tex. App.-Texarkana 1996, no writ). A patent ambiguity arises on the reading of the trust from the words themselves. *Eckels,* 111 S.W.3d at 695; *In re Brown,* 922 S.W.2d at 608. A latent ambiguity exists when the trust appears to convey a sensible meaning on its face but cannot be carried out without further clarification. *Eckels,* 111 S.W.3d at 695; *see Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 n. 4 (Tex.1995) (explaining latent ambiguity would exist if a contract called for goods to be delivered to "the green house on Pecan Street," but there were in fact two green houses on Pecan Street).

■■■■ Where there is latent or patent ambiguity, a court may admit extrinsic evidence to show the grantor's intent. *Eckels,* 111 S.W.3d at 696; *In re Estate of Cohorn,* 622 S.W.2d 486, 487–88 (Tex.App.-Eastland 1981, writ ref'd n.r.e.); *see Stewart v. Selder,* 473 S.W.2d 3, 7 (Tex.1971) ("[W]e have stated on several occasions that where the intention of the testator is not clearly expressed by the language of the will, it may be found by looking to the provisions of the instrument as a whole and to the circumstances surrounding its execution."). Although the Texas Su-

preme Court has, in the past, stated that a "court may *always* receive and consider evidence concerning the situation of the [grantor], the circumstances existing when the [trust] was executed, and other material facts that will enable the court to place itself in the [grantor]'s position at the time," *Lang*, 35 S.W.3d at 640 (quoting *Stewart v. Selder*, 473 S.W.2d 3, 7 (Tex. 1971)), the supreme court explained in 2000 that "this broad approach to the admissibility of extrinsic evidence applies only when a term is open to more than one construction." *Lang*, 35 S.W.3d at 639 (citing *Lehman v. Corpus Christi Nat'l Bank*, 668 S.W.2d 687, 689 (Tex.1984)). Thus, extrinsic evidence may only be considered when the terms of the instrument are ambiguous.

 Finally, in interpreting the provisions of a trust instrument, if possible, we must construe the instrument to give effect to all provisions so that no provision is rendered meaningless. *Eckels*, 111 S.W.3d at 694. And, in interpreting the trust, we look to the law as it existed at the time the trust was executed. *Hagaman v. Morgan*, 886 S.W.2d 398, 400 (Tex.App.-Dallas 1994, writ denied).

## C. Determining the Grantor's Intent

Using the above rules of construction, we must determine what Ray Ellison Sr. meant in 1982 when he stated that he wanted the Trust to benefit the *descendants* of his son, Ray Ellison Jr., and his daughter, Bonnie Egan.

In the Trust, Ray Ellison Sr. identified the descendants of his son and daughter parenthetically: "the descendants living at this time are TRACY EGAN, DARLENE ELLISON AND ARLENE ELLISON." Further, Ray Ellison Sr. stated in the Trust that at the time the Trust was executed "the beneficiaries are well provided for by their parents." Arleene and Dar-

leene Ellison, and Frost Bank, point to these two phrases used by Ellison Sr. in the Trust and argue that we can determine Ray Ellison Sr.'s intent from the four corners of the trust instrument because these phrases show Ray Ellison Sr.'s unambiguous intent.

Although the Lindners disagree that the above two phrases indicate Ray Ellison Sr.'s unambiguous intent, they also argue that the words used in the Trust are unambiguous. According to the Lindners, "descendants" is an unambiguous term with a specific legal meaning that we can determine by using family law statutes in existence at the time the Trust was created as a constructive aid.

In contrast, Tracy Egan Calloway argues that "descendants" is an ambiguous term and that the trial court erred in not allowing her to admit extrinsic evidence of Ray Ellison Sr.'s intent.

As explained below, we believe that "descendants" is not an ambiguous term and that the family statutes in existence in 1982 should be used as a constructive aid of Ray Ellison Sr.'s intent.

*1. Does Ray Ellison Sr.'s use of the phrase "descendants living at this time" indicate his clear intent to exclude adult adoptees?*

Arleene and Darleene Ellison argue that Ellison Sr.'s intent is clear from the four corners of the trust instrument. According to Arleene and Darleene, by parenthetically identifying Tracy Egan, Darleene Ellison, and Arleene Ellison as *descendants living at this time*, Ellison Sr. indicated that at the time of the creation of the Trust, the *only descendants living* were Tracy Egan, Darleene Ellison, and Arleene Ellison. Thus, they argue that because the Lindners were *living* at the time the Trust was created, Ellison Sr. could not possibly have intended to include them.

If Ellison Sr. had wanted the Trust to benefit a class of persons like the Lindners (those being adopted as adults), he would not have specified that the only beneficiaries living were Tracy, Darleene, and Arleene.

Frost National Bank, Independent Executor of the Estate of Ray Ellison Sr., agrees with Arleene and Darleene's argument. Frost Bank also emphasizes that Ellison Sr. specifically named the persons whom he considered to be "descendants" and who were living at the time the Trust was executed in 1982. Frost Bank points out that Ellison did not use language like "the descendants identifiable at this time" or "the descendants ascertainable at this time." Instead, he specifically stated "the descendants *living* at this time." According to Frost Bank, this "language demonstrates that Mr. Ellison contemplated that the only possible additional descendants would be persons born after 1982. This, in itself, excludes the Lindners, each of whom was born well before 1982."

The Lindners respond by arguing that they are not excluded by the language "descendants living at this time" because although they were living at the time, they were not *descendants* at the time.

We believe that Ray Ellison Sr.'s parenthetical identification of Tracy, Darleene, and Arleene as the only descendants living at this time was for identification purposes and does not indicate his clear intent to exclude adult adoptees.

*2. Does Ray Ellison Sr.'s use of the phrase "[a]t the time of executing this trust instrument, the beneficiaries are well provided for by their parents," indicate his intent to exclude adult adoptees?*

Arleene and Darleene Ellison also argue that by stating that "[a]t the time of executing this trust instrument, *the beneficiaries are well provided for by their par-*

*ents,"* Ellison Sr. indicated his intent to benefit his grandchildren, not other persons who had been raised as someone else's grandchildren for decades after the Trust was created. They emphasize that the language "the beneficiaries are well provided for by their parents," indicates Ellison Sr.'s intent to benefit only those persons then in a parent-child relationship with, and entitled to receive parental support from, Bonnie Egan and Ray Ellison Jr. They argue that the Lindners were not such people.

Frost Bank also emphasizes that the statement regarding the beneficiaries, at the time of the Trust's execution, being "well provided for by their parents" demonstrates Ellison's intent that the trust beneficiaries be only the named biological grandchildren and later-born biological grandchildren. According to Frost Bank, had Ellison "intended to include persons born before 1982 but not adopted until afterward, he [would] not have opined on whether those persons were, on March 9, 1982, 'well provided for by their parents.'"

We disagree. At the time the Trust was created, Tracy, Arleene, and Darleene were the only beneficiaries to the Trust. Thus, the sentence, "[a]t the time of executing this trust instrument, *the beneficiaries are well provided for by their parents,"* refers only to Tracy, Arleene, and Darleene.

*3. Is the term "descendants" ambiguous so that extrinsic evidence should have been admitted?*

Tracy Egan Calloway argues that "descendants" is not an unambiguous term that the trial court could construe from the instrument itself and the law but instead is ambiguous. According to Calloway, "descendants" as used by Ellison Sr. could have had "at least four possible meanings":

1. Ellison Sr. could have intended the term "descendants" to include only his

children's and grandchildren's biological offspring;

2. Ellison Sr. could have intended "descendants" to have a more expansive meaning so as to include, in addition to his biological offspring, individuals who were adopted as minors by his biological children or grandchildren, while excluding individuals who were adopted as adults;

3. Ellison Sr. could have intended "descendants" to have an even more expansive meaning so as to include not only individuals who were adopted as minors but also individuals who were adopted as adults as long as they enjoyed an *in loco parentis* relationship with his biological children and grandchildren while the adoptees were minors—that is, he could have intended that adult adoptees who actually lived in the homes of his biological children or grandchildren for a period of time while they were minors and who later were adopted as adults be considered beneficiaries, but not adult adoptees who never enjoyed an *in loco parentis* relationship; and

4. Ellison Sr. could have intended "descendants" to include in addition to biological offspring any adoptee, minor or adult, regardless whether the adoptee ever actually enjoyed an *in loco parentis* relationship with his biological children or grandchildren.

Thus, because the term "descendants" is ambiguous, Calloway argues that the trial court should have considered extrinsic evidence of what Ellison Sr. intended by his use of "descendants."

In *San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 640 (Tex.2000), the supreme court considered when extrinsic evidence may be admitted to explain a term. First, the court emphasized that when a testatrix's intent is apparent on the face of the will, extrinsic evidence is not admissible to show a contrary meaning. *Id.* It explained that extrinsic evidence is admissible only when the testatrix's will uses a word that is susceptible to more than one construction. *Id.* at 641. Thus, the court explained that in *Stewart v. Selder*, 473 S.W.2d 3, 7 (Tex.1971), extrinsic evidence was admissible to explain the testatrix's intent in using the term "cash," because "cash" "could refer to either dollar bills or other forms of currency, like checks or securities." *Lang*, 35 S.W.3d at 641. However, the testatrix in the case before it had used the term "real property." *Id.* The court explained that extrinsic evidence was not admissible to explain the testatrix's intent in using the term "real property" because real property has a settled legal meaning. *Id.* That is, "real property" is "a term with a specific meaning ascribed to it in law." *Id.* Thus, the testatrix's use of the term in her will was unambiguous and the trial court did not err in excluding "any sort of background, historical extrinsic evidence to explain" the testatrix's intent in using the term. *Id.*

██ Like "real property," we believe that "descendants" is a term with a specific meaning ascribed to it in law: "one who follows in lineage, in direct (not collateral) descent from a person." BLACK'S LAW DICTIONARY 476 (8th ed.2004). Examples of descendants are "children and grandchildren." *Id.* Thus, the term "descendants" is not ambiguous. A descendant of Ray Ellison Jr. would be any person who follows in lineage, in direct descent from him. An example of such a "descendant" would be his "child." Thus, the issue becomes whether one adopted as an adult is considered a "child" of his adopted father with respect to third persons as the law existed in 1982 when the Trust was created.

*4. Should 1982 Family Law statutes be used as a constructive aid of Ray Ellison Sr.'s intent?*

In support of their argument that they are included within Ellison Sr.'s use of the term "descendants," the Lindners emphasize that as the law existed in 1982, when the Trust was created, descendants included those adopted as adults. According to the Lindners, pursuant to 1982 Texas Family Law statutes, a person adopted as an adult is a "child" and thus a descendant of his adopted father. In response to the Lindners' argument, Arleene and Darleene Ellison argue that we should not consider 1982 Family Law statutes because a statute cannot contradict Ellison Sr.'s unambiguous intent.

 It is true that the grantor's intent controls and that a statute cannot control or defeat a trust's "true construction." *Vaughn,* 337 S.W.2d at 796. Thus, the question is not whether persons adopted as adults should be beneficiaries of the Trust pursuant to a statute, but whom Ellison Sr. intended to designate as beneficiaries when he created the Trust. However, while a statute cannot defeat the clear intent of the grantor, a statute "may be considered as an aid to the construction" of a trust. *Id.* By interpreting the state of law with regard to "descendants" in 1982, we would not be stating that the law required persons adopted as adults to be beneficiaries of the Trust. Instead, we would be recognizing that Ellison Sr. decided to use the specific word "descendants" to define his beneficiaries and that he did not define "descendants" in the trust instrument itself. Thus, we presume that Ellison Sr., by using the word "descendants," knew what the law in 1982 considered "descendants" to encompass. *See San Antonio Area Found.,* 35 S.W.3d at 640.

*5. With respect to adopted children, what did "descendants" mean in 1982?*

*a. Progression of Adoption Laws–1931 Statute*

Before 1931, adopted persons had no right of inheritance except from the estate of the party adopting him.[3] *Armstrong v. Hixon,* 206 S.W.3d 175, 180 (Tex.App.-Corpus Christi 2006, pet. denied); *Fletcher v. Persall,* 75 S.W.2d 170, 170 (Tex.Civ.App.-Austin 1934, writ ref'd). In 1931, the Legislature enacted the following statute (formerly Article 46a of the Revised Civil Statutes), entitled "Adoption of Minor Children," providing for the adoption of minor children:

> When a child is adopted in accordance with the provisions of this Article, all legal relationships and all rights and duties between such child and its natural parents shall cease and terminate, provided however, that nothing herein shall prevent such adopted child from inheriting from its natural parent; all adopted children shall inherit from the adopted as well as its natural parents. Said child shall thereafter be deemed and held to be, *for every purpose, the child of its parent or parents by adoption as fully as though born of them in lawful wedlock.* Said child shall be entitled to proper education, support, maintenance, nurture and care from said parent or parents by adoption, and shall inherit from said parent or parents by adoption, and as the child of said parents or parents by adoption, as fully as though born to them in lawful wedlock; subject, however, to the provisions of this Act. Said parent or parents by adoption shall be entitled to the services, wages, control, custody and company of said adopted child, and shall, as such adopting parent or parents, inherit from and as the parent or parents of said adopted child as

---

**3.** Moreover, if the adopter had biological children, the adoptee was limited to inheriting

"one-fourth of the estate of the party adopting him or her." *Fletcher,* 75 S.W.2d at 170.

fully as though the child had been born to them in lawful wedlock; provided, however, that upon the death of such adopted child, while unmarried and without issue of its body, all its property, of whatsoever kind and nature, shall pass and descend to the adopting parent or parents, if living, but if such adopting parent or parents be not living, then all such property shall pass and descend to the next of kin of said adopting parent or parents according to the then law of descent and distribution, and not to the next of kin of such adopted child; and provided that. . . .

Acts of 1931, 42nd Leg., p. 300, ch. 177, § 9 (emphasis added). This 1931 statute "did not have the sweeping effect suggested by the language quoted above." *Cutrer v. Cutrer*, 162 Tex. 166, 345 S.W.2d 513, 516 (1961). "[T]he legal relationship established by the 1931 Act was effective only 'as between the adopting parent and the adopted child.'" *Id.* Thus, "[w]here the adopting parent or his estate was concerned, a child adopted under the provisions of the statute had all of the rights of a natural child." *Id.* However, "as to all persons other than the adoptive parents, an adopted child's status was the same as it would have been if no act of adoption had occurred." *Id.* Therefore, "[t]here is no basis then for saying that the status conferred by the 1931 Act requires that an adopted child be regarded as a natural child of the adopter for the purpose of construing instruments executed by third persons." *Id.* at 516–17. This rule is called the "stranger to the adoption rule." According to the rule, adopted persons could inherit from their adoptive parents *but not through them;* that is, they could not inherit from one who was a "stranger to the adoption." *See id.*

### b. 1947 Statute

In 1947, the Legislature enacted a statute providing for the adoption of adults in the same manner as was then provided for adopting minors. *See* Act of 1947, 50th Leg., R.S., ch. 428, 1947 Tex. Gen. Laws 1009. Thus, the statute tracked the above language providing for the adoption of minor children. However, as noted, the supreme court applied the "stranger to the adoption rule" to that statute. *See Cutrer*, 345 S.W.2d at 516. Therefore, the stranger to the adoption rule applied to this 1947 statute providing that those adopted as adults will "be deemed and held to be, *for every purpose, the child of [his] parent or parents by adoption as fully as though born of them in lawful wedlock.*" *See* Act of 1947, 50th Leg., R.S., ch. 428, 1947 Tex. Gen. Laws 1009.

### c. 1951 Statute

In 1951, the Legislature amended the adoption statute relating to minors:

When a minor child is adopted in accordance with the provisions of this Article, all legal relationship and all rights and duties between such child and its natural parents shall cease and terminate, and such child shall thereafter be deemed and held to be for every purpose the child of its parent or parents by adoption as fully as though naturally born to them in lawful wedlock. Said child shall be entitled to proper education, support, maintenance, nurture and care from said parent or parents by adoption, and said parent or parents by adoption shall be entitled to the services, wages, control, custody and company of said adopted child, all as if said child were their own natural child. For purposes of inheritance under the laws of descent and distribution such adopted child shall be regarded as the child of the parent or parents by adoption, such adopted child and its descendants inheriting from and through the parent or parents by adop-

tion and their kin the same as if such child were the natural legitimate child of such parent or parents by adoption, and such parent or parents by adoption and their kin inheriting from and through such adopted child the same as if such child were the natural legitimate child of such parent or parents by adoption. The natural parent or parents of such child and their kin shall not inherit from or through said child, but said child shall inherit from and through its natural parent or parents. Nothing herein shall prevent any one from disposing of his property by will according to law. *Such adopted child shall be regarded as a child of the parent or parents by adoption for all other purposes as well, except that where a deed, will, or other instrument uses words clearly intended to exclude children by adoption, such adopted child shall not be included in such class. ...*

Acts of 1951, 52nd Leg., ch. 249, § 3, 1951 Tex. Gen. Laws 388, 390 (emphasis added). This is the statute that abrogated the stranger to the adoption rule with respect to those *adopted as minors. See Ortega v. First RepublicBank Fort Worth, N.A.,* 792 S.W.2d 452, 454 (Tex.1990) ("Before 1951, the general rule in Texas was that an adopted child was not entitled to property conveyed or devised to the natural children of the adoptive parent unless the intent to include was indicated by additional language or circumstances. This presumption of exclusion was changed by the passage of a 1951 amendment to the adoption statutes."). However, the Legislature did not amend the adult adoption statute. Thus, the 1951 amendment, with respect to adult adoptees, did not abrogate the stranger to the adoption rule.

*d. 1973 Statute*

In 1973, the Legislature adopted the Texas Family Code and codified the following child adoption statute:

### SUBCHAPTER A. ADOPTION OF CHILDREN

Sec. 16.09. Effect of Adoption Decree

(a) On entry of a decree of adoption, the parent-child relationship exists between the adopted child and the adoptive parents as if the child were born to the adoptive parents during marriage.

(b) An adopted child is entitled to inherit from and through his adoptive parents as though he were the natural child of the parents.

(c) The terms "child," "descendant," "issue," and other terms indicating the relationship of parent and child include an adopted child unless the context or express language clearly indicates otherwise.

It also codified a statute relating to the adoption of adults:

### SUBCHAPTER B. ADOPTION OF ADULTS

Sec. 16.55. Effect of Adoption Decree

On entry of the decree of adoption, the adopted adult is the son or daughter of the adoptive parents and of the natural parents, for inheritance purposes. However, the natural parents may not inherit from the adopted adult.

Act of 1973, 63d Leg., R.S., ch. 543, § 16.55, 1973 Tex. Gen. Laws 1411.

*e. 1975 Statute*

In 1975, the Legislature amended the statute relating to adoption of adults (it did not amend the statute relating to the adoption of minor children):

Sec. 16.55. Effect of Adoption Decree

On entry of the decree of adoption, the adopted adult is the son or daughter of the adoptive parents *for all purposes,*

and of the natural parents for inheritance purposes only. However, the natural parents may not inherit from or through the adopted adult.

Acts of 1975, 64th Leg., R.S., ch. 475, § 43, 1975 Tex. Gen. Laws 1253, 1270 (emphasis added). This 1975 statute is the law that was in effect at the time the Trust was created. This is also the amendment that the Lindners claim abrogated the stranger to the adoption rule with respect to adults. They argue that the phrase "for all purposes" means that the adopted adult can inherit *through* his adoptive parents.

Arleene and Darleene Ellison, in contrast, argue that this amendment did not abrogate the stranger to the adoption rule and point to the differences between the child and adult statutes. They emphasize that the minor adoption statute, in subsection (c), contained an "inclusionary presumption," which expressly abrogated the stranger to the adoption rule. However, the adult version contained no such inclusionary presumption. Thus, according to Arleene and Darleene, the Legislature must have intentionally not included such an "inclusionary presumption" in the adult statute. And, by not including such a presumption, the common-law exclusionary presumption known as the stranger to the adoption rule remained in effect for adult adoptees. We agree with Arleene and Darleene Ellison.

We find it significant that the Legislature failed to include an inclusionary presumption in the 1975 statute. And, we find the Lindners' argument that the language "for all purposes" abrogated the stranger to the adoption rule unpersuasive. When it enacted this statute, the Legislature knew that the Texas Supreme Court had interpreted statutory language like "for all purposes" as not abrogating the stranger to the adoption rule. *See Cutrer,* 345 S.W.2d at 516 (interpreting statutory language that included the phrase "for every purpose" to apply only to the adoptive parent and child and to not allow an adoptive child to inherit "through" the adoptive parent). Thus, had it wanted to abrogate the stranger to the adoption rule with respect to adults, the Legislature would have explicitly included an inclusionary presumption. *See Foster v. Foster,* 641 S.W.2d 693, 695 (Tex.App.-Fort Worth 1982, no writ) ("Even now [in 1982], it is not the law of this State that one who was an adult when adopted has entitlement under the laws of descent and distribution to recover as a child from anyone other than his adoptive parents."). We believe the Legislature did so in 1995 when it amended the statute to state that an adopted adult "is entitled to inherit *from and through* the adopted adult's adoptive parents as though the adopted adult were the biological child of the adoptive parents."[4] Act of April 6, 1995, 74th Leg.,

---

**4.** In 1995, the Family Code was recodified. With respect to adopting minors, section 162.017 of the Family Code, titled "Effect of Adoption," provided the following:

(a) An order of adoption creates the parent-child relationship between the adoptive parent and the child for all purposes.

(b) An adopted child is entitled to inherit from and through the adoptive parents as though the child were the biological child of the parents.

(c) The terms "child," "descendant," "issue," and other terms indicating the relationship of parent and child include an adopted child unless the context or express language clearly indicates otherwise.

(d) Nothing in this chapter precludes or affects the rights of a biological or adoptive maternal or paternal grandparent to reasonable access, as provided in Chapter 153.

Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, sec. 162.017, 1995 Tex. Gen. Laws 113 (current version at TEX. FAM.CODE ANN. § 162.017 (Vernon Supp.2007)). With respect to adults, section 162.507, also titled "Effect of Adoption" provided the following:

R.S., ch. 20, § 1, sec. 162.507(b), 1995 Tex. Gen. Laws 113, 238 (current version at TEX. FAM.CODE ANN. 162.507 (Vernon Supp. 2005)) (emphasis added); *see Armstrong v. Hixon,* 206 S.W.3d 175, 180–81 (Tex.App.-Corpus Christi 2006, pet. denied) ("Not until 1995 did the Legislature modify the adult adoption statute to specifically provide that an adopted adult might inherit 'from and through' the adopted adult's adoptive parents.").

The Lindners, however, point to a 1984 Texas Supreme Court case, decided two years after Ray Ellison Sr. created the Trust: *Lehman v. Corpus Christi National Bank,* 668 S.W.2d 687 (Tex.1984). They argue that the following language in *Lehman* supports their assertion that the 1975 statute abrogated the stranger to the adoption rule with respect to adults:

> Keith Lehman would have us announce a presumption that adopted adults are not included within the beneficiaries of a class gift in a testamentary instrument of someone other than the adoptive parents. We decline to do so. This presumption would be a form of the "stranger to the adoption" rule, which has now been rejected in Texas, *see Vaughn v. Gunter,* 458 S.W.2d 523 (Tex.

Civ.App.-Dallas), *writ ref'd n.r.e.,* 461 S.W.2d 599 (Tex.1970), as well as in a majority of American jurisdictions considering the question. *See Elliott v. Hiddleson,* 303 N.W.2d 140, 144 (Iowa 1981).

*Id.* at 688. We, however, find *Lehman* distinguishable.

The will at issue in *Lehman* specifically included adoptees as descendants, with no age distinction between children and adults. *Id.* at 688. Thus, the language from *Lehman* upon which the Lindners rely to support their claim is mere *dicta.* Further, in making its assertion that the stranger to the adoption rule had already been eliminated by the 1951 amendment to the statute, the *Lehman* court relied upon a court of appeals decision. *See id.* That case, *Vaughn v. Gunter,* 458 S.W.2d at 524–25, dealt with the issue of whether an individual who had been adopted as a *minor* was included in the class defined as "children" of his adopted father. In holding that the minor adoptee was a child of his adopted father, the *Vaughn* court relied on *the 1951 statute relating to minors* that clearly abrogated the stranger to the adoption rule *with respect to minors.*[5] The *Vaughn* court did not address the

---

(a) The adopted adult is the son or daughter of the adoptive parents for all purposes.
(b) The adopted adult is entitled to inherit from and through the adopted adult's adoptive parents as though the adopted adult were the biological child of the adoptive parents.
(c) The adopted adult retains the right to inherit from the adult's biological parents. However, a biological parent may not inherit from or through an adopted adult.
Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, sec. 162.507(b), 1995 Tex. Gen. Laws 113, 238 (current version at TEX. FAM.CODE ANN. § 162.507 (Vernon Supp.2007)). We note that the Lindners argue that the stranger to the adoption rule was abrogated with the 1975 amendment and that the 1995 amendment was intended to revise the law without substantive change. For support, they point

to statements made by the bill sponsors assuring committee members that the recodification made no substantive changes to the law. However, as recently explained by the Texas Supreme Court, the "general statement that a recodification is not intended to effect substantive changes does not ... override the plain wording of the statutory provisions directly in issue" in a case. *Entergy Gulf States, Inc. v. Summers,* No. 05–0272, 2007 WL 2458027, at *3, —— S.W.3d ——, —— (Tex. 2007).

**5.** In refusing the writ of error, the supreme court did approve of the court of appeals's analysis with respect to the 1951 statute. *Vaughn v. Gunter,* 461 S.W.2d 599, 600 (Tex. 1970) (per curiam). However, that statute, once again, dealt with the *adoption of minors.*

1951 statute concerning the adoption of adults. Therefore, we find *Lehman* and its reliance on *Vaughn* distinguishable from this case.

Thus, by using the 1975 statute as a constructive aid, we conclude that when Ray Ellison Sr. created the Trust in 1982, he did not intend the term "descendants" to include those persons adopted as adults.

## ATTORNEYS' FEES

In a cross-issue, the Trustees argue that the trial court abused its discretion in awarding attorneys' fees to (1) Ray Ellison Jr. because he is not a party in the case; and (2) the Lindners because they did not incur attorneys' fees.

With respect to Ray Ellison Jr.'s entitlement to an award of attorneys' fees, we note that at the trial-court level, Ray Ellison Jr. joined the Lindners' motion for recovery of fees. The trial court granted that motion and in the final judgment awarded the Lindners and Ellison Jr. "their attorneys' fees and expenses in the amount of $90,993.54 through the date of this Judgment, said fees and expenses to be paid from the funds of the Trust...." In addition to arguing that the Lindners are not entitled to such fees and expenses, the Trustees argue that the trial court abused its discretion in awarding attorneys' fees to Ray Ellison Jr., a non party. In their appellees' brief, the Lindners agree that Ray Ellison Jr., as a non party, is not entitled to an award of attorneys' fees. Therefore, we modify the trial court's judgment to omit any reference to Ray Ellison Jr.'s entitlement to attorneys' fees.

With respect to whether the Lindners are entitled to an award of attorneys' fees, the Trustees argue that because the attorneys' fees were paid for by Ray Ellison Jr., who is not a party to this case, and because the Lindners did not pay the fees

themselves, awarding them such fees is inequitable and unjust. At the hearing on attorneys' fees, Ray Ellison Jr. and the Lindners testified that Ellison Jr. agreed to pay the Lindners' attorneys' fees. However, each of the Lindners also testified that if they recovered any money from the Trust, they would reimburse Ellison Jr. for the fees. Thus, in response to the Trustees' argument, the Lindners argue that the award of attorneys' fees is equitable and just because while Ray Ellison Jr. agreed to pay their attorneys' fees "up front," they are obligated to reimburse him.

This case involves two statutes that provide for an award of attorney's fees: section 114.064 of the Texas Trust Code and section 114.064 of the Declaratory Judgments Acts. Section 114.064 of the Texas Trust Code provides that "[i]n any proceeding under this code the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just." TEX. PROP.CODE ANN. § 114.064 (Vernon 2007). The granting or denying of attorney's fees under this section is within the sound discretion of the trial court, and a reviewing court may not reverse the trial court's judgment absent a clear showing that the trial court abused its discretion by acting without reference to any guiding rules and principles. *Hachar v. Hachar*, 153 S.W.3d 138, 142 (Tex. App.-San Antonio 2004, no pet.). Section 37.009 of the Declaratory Judgments Act is virtually identical: "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). Like section 114.064, an award of attorney's fees under section 37.009 is clearly within the trial court's discretion and is not dependent on a finding that a party "substantially prevailed." *Barshop*

*v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex.1996); *Hachar*, 153 S.W.3d at 142.

Here, the parties stipulated that the attorneys' fees were reasonable and necessary. The Trustees, however, complain of the second requirement of both statutes, that the fees be equitable and just. According to the Trustees, "[i]t is not equitable or just to award fees to parties who do not incur fees." For support, the Trustees cite to *Beasley v. Peters*, 870 S.W.2d 191, 196 (Tex.App.-Amarillo 1994, no writ), and *Keever v. Finlan*, 988 S.W.2d 300, 308 (Tex.App.-Dallas 1999, pet. dism'd). However, both *Beasley* and *Keever* are distinguishable.

At issue in *Beasley* was whether a sanction of attorney's fees awarded to an attorney appearing pro se as a litigant is an appropriate sanction. *Beasley*, 870 S.W.2d at 191. Because the attorney appearing pro se did not *incur* attorney's fees, the court of appeals held that "a sanction of an award of attorney's fees to an attorney appearing pro se as a litigant [was] not an appropriate sanction." *Id.* at 196.

Similarly *Keever* dealt with the issue of whether a party had *incurred* attorney's fees. At issue in *Keever* was whether a party was entitled to attorney's fees under section 552.323 of the Texas Open Records Act, which provides that a trial court may assess costs of litigation and reasonable attorney fees *incurred* by a plaintiff or defendant who substantially prevails. *Keever*, 988 S.W.2d at 306. In holding that the appellant was not entitled to attorney's fees under section 552.323, the Dallas Court of Appeals focused on the requirement that the fees be incurred and reasoned that the appellant had not incurred fees. *Id.* at 308.

Here, however, we are not dealing with whether a party "incurred" fees; instead, our issue is whether the award of fees to the Lindners pursuant to the Texas Trust Code and Declaratory Judgments Act was "equitable and just." The Trustees have cited no authority for the proposition that it is unequitable and unjust to award attorney's fees to parties who have had their fees paid up front by another party, subject to reimbursement. Under the circumstances of this case, we cannot hold that the trial court abused its discretion.

## CROSS–ISSUE BY TRACY EGAN CALLOWAY

Tracy Egan Calloway also brings a cross-issue, arguing that in the event we reverse the trial court's order, we should not reverse and render judgment in favor of the Lindners because they did not negate her affirmative defenses of fraud, constructive fraud, illegality, and estoppel as well as the equitable defense of unclean hands. However, having affirmed the trial court's judgment, we need not reach Calloway's cross-issue on appeal.

## CONCLUSION

Because the trial court did not err in concluding that Ray Ellison Sr. intended the term "descendants" to not include those persons adopted as adults and because it did not abuse its discretion in awarding attorneys' fees, we affirm, as modified, the judgment of the trial court.

REBECCA SIMMONS, Justice, dissenting.

In this case, the old adage "bad facts make bad law" is particularly true. The record paints an unattractive picture of Ray Ellison, Jr. ("Ray Jr.") and the Lindner boys and the motive surrounding their adoption. The record before the trial court was replete with evidence that the adoption of the adult Lindner boys by Ray Jr. was merely a way in which Ray Jr.

could attempt to exercise control over his father's trust. There was evidence that Ray Jr. was not only estranged from his father when the trust was created, but estranged from his daughters and niece, the beneficiaries of the trust. The issue in this appeal is whether we (1) apply the law and reward what could be characterized as unworthy beneficiaries or (2) neglect established precedent and impose our own intent on the inter vivos, irrevocable trust to exclude the unworthy contenders to the Ray Ellison, Sr. fortune. I choose the former and thus, must respectfully dissent.

I agree with much of the majority opinion; we part ways, however, over the status of adopted adults in 1982 and whether the "stranger to the adoption" rule was in effect in 1982, when the Trust was created. I believe that in 1982, adopted adults were the sons or daughters of their adoptive parents "for all purposes," including inheriting from and through the adoptive parents.

The controlling law in effect in 1982, when the Trust was created, provided:

On entry of the decree of adoption, the adopted adult is the son or daughter of the adoptive parents for all purposes, and of the natural parents for inheritance purposes only. However, the natural parents may not inherit from or through the adopted adult.

Acts of 1975, 64th Leg., R.S., ch. 475, § 43, 1975 Tex. Gen. Laws 1253, 1270.

The meaning of the statute is clear— that adopted adults are the sons or daughters of their adoptive parents "for all purposes." Although Arleene and Darleene Ellison argue that this 1975 amendment did not abrogate the stranger to the adoption rule, the Texas Supreme Court determined otherwise in *Lehman v. Corpus Christi Nat'l Bank*, 668 S.W.2d 687 (Tex. 1984). In *Lehman*, the question before the court was whether an adopted adult

qualified as a "descendant" of his adoptive father within the terms of his grandfather's will. *Id.* at 688. The will expressly defined "descendants" as including "the **children** of the person designated, and the issue of such children, and such children and issue shall always include those who are adopted." *Id.* (emphasis added). Thus, those adopted as children were unambiguously defined as descendants, but the issue was whether "children ... who are adopted" included those adopted as adults. The supreme court reasoned that adopted adults were included because the will's definition of "descendants" drew no distinction between natural and adopted children, "if adopted adults are incapable of taking, adult natural children would likewise be excluded from the class of beneficiaries." *Id.* The court expressly rejected the "stranger to the adoption" rule by stating:

Keith Lehman would have us announce a presumption that adopted adults are not included within the beneficiaries of a class gift in a testamentary instrument of someone other than the adoptive parents. We decline to do so. This presumption would be a form of the "stranger to the adoption" rule, **which has now been rejected in Texas,** *see Vaughn v. Gunter*, 458 S.W.2d 523 (Tex. Civ.App.-Dallas), *writ ref'd n.r.e.*, 461 S.W.2d 599 (Tex.1970), as well as in a majority of American jurisdictions considering the question. *See Elliott v. Hiddleson*, 303 N.W.2d 140, 144 (Iowa 1981). Any such presumption would be at best only a rule of construction that would yield to a clear expression of contrary intent. *Shriner's Hospital for Crippled Children v. Stahl*, 610 S.W.2d 147 (Tex.1980). Hence, the proposed rule would be ineffective in this case in which the class of beneficiaries unambiguously includes [the adopted adult].

Moreover, such a rule would be contrary to the public policy of this state.

*Id.* at 688 (emphasis added).

While I agree that the language in *Lehman* is dicta and that it was decided two years after the Trust was created, I cannot ignore that the supreme court in *Lehman* interpreted the 1975 statute at issue as having abrogated the stranger to the adoption rule. The supreme court goes on to point out that the stranger to the adoption rule had likewise been rejected in a majority of American jurisdictions and was "contrary to the public policy of this state." *Id.* Although the application of *Lehman* to this case may seem to cause an inequitable result, the failure to recognize that the stranger to the adoption rule was abrogated in 1975 may have serious unintended consequences. Any practitioner reading *Lehman* prior to this decision would have concluded that the stranger to the adoption rule was abrogated by the 1975 statute and advise her clients accordingly. Yet, under the reasoning of the majority opinion, the stranger to the adoption rule, referred to as bad public policy under *Lehman*, was not abrogated until some twenty years later, in a recodification of the statute in 1995.[1] *Lehman* has been the law in this area for the past twenty-five years and I would apply it to this case.

### Conclusion

Thus, by using the 1975 statute as a constructive aid, I cannot conclude that Ray Ellison, Sr. intended to preclude adult adoptees as "descendants" of his son, Ray Ellison, Jr. Therefore, I cannot agree to affirm the trial court's summary judgment. This case presents a very unfortunate fam-

ily dispute. The record reflects that the Lindner boys were adopted by Ray Jr., in part, to allow Ray Jr. to exercise control over his father's trust. Although the Lindner boys do not look like worthy beneficiaries, I would not change twenty-five years of law to refute their claims.

---

1. The legislative history suggests no substantive change was made to the 1975 statute, and that it was merely being renumbered. Recodification of the Family Code: Hearing on Tex. H.B. 655 Before the House Committee on Justice & Family Issues; 74th Leg., R.S. (February 8, 1995); Recodification of the Family Code: Hearing on Tex. H.B. 655 Before the Senate Committee on Jurisprudence; 74th Leg., R.S. (April 4, 1995).