Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


# OPINION

No. 04-08-00079-CV

**IN RE ESTATE OF** Belton Kleberg **JOHNSON**, Deceased

From the Probate Court No 1, Bexar County, Texas
Trial Court No. 2001-PC-1819
Honorable Polly Jackson Spencer, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:        Catherine Stone, Chief Justice
                Karen Angelini, Justice
                Steven C. Hilbig, Justice

Delivered and Filed:  February 16, 2011

AFFIRMED

Appellants' motion for rehearing is denied. This court's opinion and judgment dated December 1, 2010 are withdrawn, and this opinion and judgment are substituted. Our prior opinion contained an incorrect reference to Laura Johnson serving as co-trustee of a foundation as opposed to Laura Johnson serving as co-trustee of a management trust. We substitute this opinion to delete the erroneous factual reference which does not affect this court's prior analysis.

This appeal arises from a probate proceeding in which a jury found Belton Kleberg Johnson ("B") executed certain wills and trusts as a result of undue influence. The jury further found that the reasonable and necessary fees and expenses for the services of Plaintiffs' attorneys in connection with both the will contest and the trust contest were in excess of $6.1 million, plus

additional attorneys' fees in the event of an appeal. The trial court entered judgment on the verdict, denying probate of certain wills and admitting B's 1997 will to probate. Additionally, the judgment invalidated certain trust documents. On appeal, the independent executor of B's estate, B's widow, and a co-trustee of a trust created by B, challenge the sufficiency of the evidence to support the jury's finding of undue influence. They also raise numerous issues relating to the attorneys' fee award. We affirm the trial court's judgment.

## BACKGROUND

### A. The Family Members

B was a descendent of famed King Ranch heritage. He and his first wife, Patsy, whom he divorced in 1987, were the parents of three children: Cecilia McMurrey ("Ceci"), Sarah Pitt ("Sarah), and Kley Johnson ("Kley"). Kley, who died in a car accident in 1991, was married to Cecilia Hager ("Hager"). Alice Truehart Johnson and Henry Kleberg Johnson are Kley and Cecilia's children. Sarah married Steven Pitt, and Sarah Spohn Kleberg Pitt, Stephen McCarthy Pitt, Jr., and Allegra Elizabeth McCarthy Pitt are their children. Ceci married Mark McMurrey, and Harry Bennett McMurrey, Belton Kleberg McMurrey, and Estella Lewis McMurrey are their children.

Lynne Johnson was B's second wife. They were married in February of 1991, and Lynne died of cancer in January of 1994.

Laura Johnson was B's third wife. B met Laura in Hong Kong in January of 1994 within days after Lynne's death. At the time, Laura was still married to her first husband, who also was her business partner; however, they had been separated for several years. Laura's divorce from her first husband was final in January or April of 1996, and she married B on November 8, 1996.

### B. The Estate Planning Documents

Over the course of at least four decades, B engaged in extensive estate planning activity with the aid of various professionals. The following individuals were involved at varying times in B's estate planning: (1) Ed Copley - an estate planning attorney B hired in 1991; (2) Robert Phelps – a generational planning specialist with J.P. Morgan who was also an attorney; (3) Stacy Eastland – another estate planning attorney B hired in 1997; and (4) Peter Milton – a loan officer with J.P. Morgan who subsequently became an investment advisor for B's foundation.

Following B's death in 2001, Copley obtained an order admitting to probate B's 1999 will and 2000 Codicil and was named as the independent executor of B's estate. B's children and grandchildren challenged that order in the suit giving rise to this appeal. A review of B's estate planning documents for the decade preceding his death is helpful to understanding the parties' claims.

B's 1991 will created a life estate for his second wife, Lynne, with the remainder going into trust for B's grandchildren. The 1991 will listed three specific charities as contingent beneficiaries in the event all of B's descendants predeceased him. B's 1993 will was similar to his 1991 will; however, a subsequent codicil changed the remainder beneficiaries from B's grandchildren to his children. B's 1995 will left $1 million net of tax in trust to each grandchild with the remainder going to five specific charities.

B's 1997 will left his estate to a 1997 Management Trust. In the 1997 Management Trust, $1,000,000 net of tax was left in trust for each grandchild. The remainder of the estate was to be held in trust for Laura for her life. Laura had a power of appointment and could leave up to one-half of the remaining estate to any or all of B's descendants, and the other one-half of

the remaining estate (or the entire remainder if Laura did not exercise the power of appointment) was to be distributed to the same five specific charities listed in the 1995 will.

In 1989, B created Johnson Properties. B was the general partner of Johnson Properties, and the trusts of B's children were limited partners. Johnson Properties owned a limited partnership interest in SA-2000, which owned the Hyatt Hotel on the San Antonio River Walk. Upon the dissolution of Johnson Properties in 1998, B and the trusts individually owned the partnership interests in SA-2000. B formed a new family limited partnership, BKJ Interests, to which he transferred his King Ranch royalties and the interest in SA-2000 which he formerly owned through Johnson Properties. The record is replete with evidence that the effect of the dissolution of Johnson Properties on B's estate plan was intentionally kept secret from Ceci and Sarah until B's death.

Around the same time as the Johnson Properties dissolution, B created the 1998 Family Trust, which eventually obtained a portion of B's interest in BKJ Interests. B's 1998 will left his estate to a 1998 Management Trust. In the 1998 Management Trust, an aggregate of $7 million was left in trust for B's grandchildren; however, that amount was offset by the fair market value of the assets held in the 1998 Family Trust. The remainder of the estate was held in trust for Laura for her life. Laura then had a power of appointment similar to the power contained in the 1997 will, except the remaining one-half (or the entire remainder if Laura did not exercise the power of appointment) was distributed to the Belton Kleberg Johnson Foundation. Although the trust lists some organizations which B desired to be the primary focus of distributions from the foundation, the trustee of the foundation ultimately controlled the distributions.

B's 1999 will left his estate to the 1998 Management Trust as amended and restated in 1999. The 1998 Management Trust as restated no longer mentioned a distribution in trust for the

grandchildren. The entire estate is instead held in trust for Laura for her life, and the provisions upon her death regarding the remainder were unchanged from the 1998 Management Trust.

## C. The Attorneys and the Claims

The Lawter Firm represented the following plaintiffs during the course of the underlying controversy: (1) B's daughter Sarah, individually and as a beneficiary of her 1962, 1970, 1976, and 1990 trusts; (2) B's daughter Ceci, individually and as a beneficiary under her 1962, 1970, 1976, and 1996 trusts; (3) B's daughter-in-law Hager, individually, as successor-in-interest to Kley, as executrix of Kley's estate, as co-trustee of Kley's 1970 trust, and as beneficiary of the trusts created under Kley's will; (4) B's granddaughter Alice, individually and as next friend for her brother Henry; (5) Houston Trust Co., as trustee of the 1962 trusts of Sarah and Ceci and their descendants, as co-trustee of the 1970 trusts for Sarah and Ceci and their descendants, and as trustee of the 1990 and 1996 management trusts; and (6) Carper Capt, as co-trustee of the 1970 trust for Hager and Kley's descendants. The Hartnett Firm represented all of B's grandchildren with the exception of Alice and Henry.

Each of the individual plaintiffs and all of the trustee plaintiffs sued B for breach of his fiduciary duties in relation to the children's trusts and the dissolution of Johnson Properties. Each of the individual plaintiffs also sued B's widow Laura for tortiously interfering with their inheritance rights and contested the validity of the will and codicil admitted to probate. They further sought to probate several alternative wills and codicils. B's grandchildren also sued J.P. Morgan for breaching its fiduciary duties arising from the 1998 Family Trust. Finally, Sarah and Ceci contested the management trusts. All of the plaintiffs will collectively be referred to herein as "Appellees."

## UNDUE INFLUENCE – SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

When reviewing a legal sufficiency or "no evidence" challenge, we determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Id*. Appellate courts will sustain a legal sufficiency or "no evidence" challenge when: (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). By contrast, when reviewing a factual sufficiency challenge, we consider all the evidence supporting and contradicting the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller*, 168 S.W.3d at 819. "They may choose to believe one witness and disbelieve another." *Id*. "Reviewing courts cannot impose their own opinions to the contrary." *Id.* "Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." *Id*.

## B.  Law on Undue Influence

"[U]ndue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power." *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963).  "*Rothermel v. Duncan*, 369 S.W.2d 917, 919 (Tex. 1963), [is] the seminal Texas will contest case" in which the Texas Supreme Court established a three-part test to determine whether undue influence exists.  *Estate of Davis v. Cook*, 9 S.W.3d 288, 292 (Tex. App.—San Antonio 1999, no pet.).  To prevail on an undue influence claim, the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence.  *Rothermel*, 369 S.W.2d at 922; *Estate of Davis*, 9 S.W.3d at 292-93.  The burden of proving undue influence is upon the party contesting its execution.  *Rothermel*, 369 S.W.2d at 922; *Estate of Davis*, 9 S.W.3d at 293.  It is, therefore, necessary for the contestant to introduce some tangible and satisfactory proof of the existence of each of the three elements.  *Rothermel*, 369 S.W.2d at 922; *Estate of Davis*, 9 S.W.3d at 293.

Not every influence exerted by a person on the will of another is undue.  *Rothermel*, 369 S.W.2d at 922; *Estate of Davis*, 9 S.W.3d at 293.  Influence is not undue unless the free agency of the testator was destroyed and a testament produced that expresses the will of the one exerting the influence.  *Rothermel*, 369 S.W.2d at 922; *Estate of Davis*, 9 S.W.3d at 293.  One may request or even entreat another to execute a favorable dispositive instrument, but unless the entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument with undue influence.  *Rothermel*, 369 S.W.2d at 922.  "Influence that was or became undue may take the nature of, but is not limited to, force, intimidation, duress,

excessive importunity[,] or deception used in an effort to overcome or subvert the will of the maker of the testament and induce the execution thereof contrary to his will." *Id*.

The exertion of undue influence is usually a subtle thing, and by its very nature usually involves an extended course of dealings and circumstances. *Id*. Undue influence may be shown by direct or circumstantial evidence, but will usually be established by the latter. *Id*.; *Estate of Davis*, 9 S.W.3d at 293. "[A]ll of the circumstances shown or established by the evidence should be considered; and even though none of the circumstances standing alone would be sufficient to show the elements of undue influence, if when considered together they produce a reasonable belief that an influence was exerted that subverted or overpowered the mind of the testator and resulted in the execution of the testament in controversy, the evidence is sufficient to sustain such conclusion." *Rothermel*, 369 S.W.2d at 922. Circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence. *Id*.; *Estate of Davis*, 9 S.W.3d at 293. "This is so because a solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside upon a bare suspicion of wrongdoing." *Rothermel*, 369 S.W.2d at 922-23.

## C. Evidence on Elements of Undue Influence

Although the parties cite cases in support of their respective positions, no two cases involving undue influence are alike, and each case must stand or fall depending upon the sufficiency of the facts proven. *Id.* at 921. Attempting to analyze each item of evidence relied upon by the parties would unnecessarily lengthen an opinion. *Id*. That is especially true in this case which took four months to try and resulted in a voluminous record. Although we do not

attempt to summarize all of the evidence, we discuss at length some of the evidence supporting the jury's finding as to each of the three elements necessary to prove undue influence.

### 1. Overpowering the Testator's Mind

Where there is competent evidence of the existence and exercise of undue influence, the issue as to whether undue influence was effectually exercised necessarily turns the inquiry and directs it to the state of the testator's mind at the time of the execution of the testament, since the question as to whether free agency is overcome by its very nature comprehends such an investigation. *Id.* at 923. "The establishment of the subversion or overpowering of the will of the testator is generally based upon an inquiry as to the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted." *Id.* "Words and acts of the testator may bear upon his mental state." *Id.* "Likewise, weakness of mind and body, whether produced by infirmities of age or by disease or otherwise, may be considered as a material circumstance in establishing this element of undue influence." *Id.*

Conflicting expert testimony was presented regarding B's susceptibility to undue influence. The evidence established that B was an alcoholic, and psychological and medical tests showed that the alcohol had an adverse effect on his mental state. Although B received both in-patient and out-patient alcohol rehabilitation services several times before his marriage to Laura, the record contains no evidence that Laura made any effort to stop B's drinking, which he admitted was on-going when he was hospitalized in 2000 and diagnosed with pancreatic cancer.

Dr. Christopher Ticknor, a psychiatrist called by the Appellees, met B while Dr. Ticknor was treating B's son, Kley. Ticknor described the medical tests performed on B in 1990 during one of his rehabilitation efforts. The tests showed organic brain syndrome/memory dysfunction. Hospital records from 1997 showed a history of continued drinking, including a two-week binge

just a few days before the hospitalization. The 2000 medical records also included evidence of an on-going history of drinking. Although the psychiatrist who saw B in 2000 did not recommend in-patient treatment, his notes reflect a concern about B's drinking, recommending B stop drinking or seek treatment.

Richard Coons, another psychiatrist called by the Appellees, testified that B feared abandonment, having lost his mother while he was young. Dr. Coons opined that B feared abandonment by Laura. Dr. Coons further opined that B's permanent cognitive defects, continued drinking, and personality features caused him to be vulnerable to undue influence.

Finally, William Dailey, a neuropsychologist called by the Appellees, testified that the 1990 tests showed B had significant memory deficit. Dailey opined that the testing was valid and that the decline in B's cognitive function increased his vulnerability to undue influence.

Richard Fulbright, a clinical neuropsychologist called by the Appellants, did not provide an opinion on undue influence. Edgar Nace, a psychiatrist called to testify by the Appellants, testified that B was not unduly influenced. Nace's testimony, however, did not differentiate between an expert medical opinion regarding undue influence and a jury's finding of undue influence. An expert's medical opinion is based on a person's mental susceptibility to undue influence independent of the facts, while a jury's finding of undue influence takes into consideration the actual facts of the case in determining whether a person was, in fact, unduly influenced. Moreover, at his deposition, Nace was asked hypothetically whether Laura could have unduly influenced B by putting a gun to his head. In his deposition, Nace responded that he was unsure; however, at trial, Nace testified the gun example would be an example of undue influence based on common sense. The jury could consider these conflicts in Nace's testimony in weighing his credibility.

The jury was required to weigh the foregoing expert testimony and determine the credibility of the testimony based on the experts' challenges to each others' opinions and extensive cross-examination challenging each expert's opinion. *See City of Keller*, 168 S.W.3d at 819 (jurors may choose to believe one witness and not another and determine the weight to be given the evidence). Based on the expert testimony, the jury could have found that B was susceptible to undue influence, and given his on-going history of alcoholism, ample opportunity existed to unduly influence B while he was drinking.

## 2. Existence & Exertion of an Influence

"[T]he establishment of the existence of an influence that was undue is based upon an inquiry as to the nature and type of relationship existing between the testator, the contestants[,] and the party accused of exerting [the] influence." *Rothermel*, 369 S.W.2d at 923. Similarly, establishment of the exertion of such influence is generally predicated upon an inquiry about the "opportunities existing for the exertion of the type of influence or deception possessed or employed, the circumstances surrounding the drafting and execution of the testament, the existence of a fraudulent motive, and whether there has been an habitual subjection of the testator to the control of another." *Id*.

Although several business associates testified that B made his own decisions and could not be controlled, the vast majority of those business associates testified that B either never drank or was never intoxicated in their presence. As a result, these associates were unaware of how B would respond to influence exercised while he was drinking or intoxicated. The jury would have the right to consider whether in a period of intoxication B's otherwise strong intellect yielded to unduly exerted importunities. *See Craycroft v. Crawford,* 285 S.W. 275, 278 (Tex. 1926).

Evidence was presented that B drank alcoholic beverages during his taped interviews with Martin Booth, who was writing a book about B's life. In one interview excerpt in which the jury could infer B was intoxicated, the following exchange occurred:

MARTIN BOOTH: You were officially engaged in the eyes of the world. Everybody knew about it.

LAURA JOHNSON: A tiny — tiny, tiny diamond, as you can see.

MARTIN BOOTH: Yes, a minute diamond. And then you set a wedding date, presumably.

LAURA JOHNSON: Yes.

MARTIN BOOTH: Which was when?

LAURA JOHNSON: Which was the 8th of November, with 8 being the lucky Chinese number, 8th of November, nineteen ninety — what year, Darling?

B JOHNSON: What — when was it?

LAURA JOHNSON: When was it Darling?

B JOHNSON: I don't —

LAURA JOHNSON: You have two strikes and you're out.

B JOHNSON: It was three — three from '97, wasn't it?

LAURA JOHNSON: No. Two strikes and you're out.

B JOHNSON: '96

LAURA JOHNSON: Oh, good boy, you can stay in the game. You can come home with me.

At trial, this clip was played for Howard Nolan, the president of United Way of San Antonio at the time B was asked to serve as chair of the United Way campaign. Nolan stated that he was uncertain if B was drinking during the taping, but it did not sound like the B he knew. The jury was free to conclude from this taped excerpt that B was intoxicated.

Several of the employees who worked in B's office, including Rita Sullivan and Madeleine Sandefur, testified regarding B's on-going drinking, as did his daughters and sons-in-law. Ceci testified that B would disappear for weeks when he was on a binge and could wind up in a different county, state, or country. Testimony was introduced that any flight B chartered was stocked with vodka, and in a nine-month period in 1999, B spent almost $7,000 on liquor and wine. Evidence was also introduced about B's mental abilities while intoxicated. For example, several witnesses testified that B would call late at night or early in the morning after he had been drinking and want to have long, rambling conversations. Rita Sullivan testified that B called her at 2:00 a.m. to ask her how to use the remote control to the television. Sullivan also called B's attorney for advice when B called Sullivan while intoxicated to obtain a $200,000 nonrefundable check to purchase a house. Martin Booth testified that B called him one night while intoxicated to report an improvement in his health and then called again the following day and repeated his report. Ceci testified that following his drinking binges, B would be depressed and contrite. The book written by Booth stated that B's drinking caused him problems, recounting that his fellow directors on AT&T's board of directors became concerned about his drinking, and B missed a party in his honor after he became intoxicated while drinking on a train on his way to the party. One time B ordered an employee to purchase tickets to Santiago, Chile, but when the employee called B about going to the airport, B had no recollection of requesting the trip. In contrast to this evidence of B's significant drinking and its effect on his conduct, Laura denied that B had a drinking problem or was ever intoxicated in her presence.

Ceci also testified that before B married Laura the family was traditionally informed of B's estate planning. Ceci testified that B did not keep his estate plan a secret, and they approached the plan as a team. After B met Laura, however, the evidence established that a

decision was made during the course of the estate planning meetings not to tell Ceci and Sarah about the dissolution of Johnson Properties or the formation of the 1998 Family Trust. Notes from estate planning meetings and telephone conferences contained numerous statements by the estate planning professionals reassuring and encouraging B not to disclose the estate plan to Ceci and Sarah.

Evidence was admitted that when Stacy Eastland was first considering the family limited partnership structure for the estate, the children were included in the partnership. However, in mid-July of 1997, the estate planning notes reflect that Ceci and Sarah were to be left out because they were "turning against" B. B was admitted to a hospital in Hong Kong on July 23, 1997. The hospital records reflect that B had been on a two-week drinking binge only days before his admission into the hospital. Around this same time, Eastland testified that B's comments during a telephone conference were not ordinary, and he could have been intoxicated, so they decided to re-do the phone call. Peter Milton from J.P. Morgan previously had told Eastland to call B in the morning because of his excessive drinking.

Appellees contend the evidence also established a habitual subjection of B to Laura's control. Although B had a prenuptial agreement with his second wife, Lynne, Laura refused to consider a prenuptial agreement, and B expressed concern that his insistence on a premarital agreement would seriously interfere with their relationship. B discussed his estate plan with Laura prior to their marriage, and Laura attended numerous estate planning meetings. Although Laura testified that she did not pay attention and was not engaged during the meetings, other estate planning professionals at the meetings testified that Laura was attentive and made comments.

Laura also tried to suggest to the jury that she was not a businesswoman as a reason for her lack of involvement, but several witnesses who were B's business associates testified that she was a smart businesswoman. Laura owned or co-owned several businesses in Hong Kong before she met B, and she helped run those businesses. One of those businesses was a pub called Mad Dogs. B invested with Laura to open a Mad Dogs at the Hyatt in San Antonio, and B loaned the business $1.4 million. After B died, a settlement was reached in which B's estate was paid only approximately $.50 for each dollar loaned and B's estate relinquished the ownership interest B had in the business. While negotiating the settlement, Milton sent an email noting the loan was unsecured. In the email, Milton stated, "Believe me B Johnson screwed this up to a fair-thee-well as we used to say up east." In another email, Milton commented, "I am a little annoyed that I didn't know how well financed Mad Dogs was. On the other hand I think that we have done more than B Johnson would have done to protect his assets; he was not good about separating his love from his assets. That is a direct quote from him." Although Laura denied negotiating the compromise with regard to Mad Dogs, another email from Milton to Copley discussing the negotiation of the compromise refers to a meeting with Laura and another person. In the email, Milton stated, "B should never have given this kind of money to Mad Dogs of San Antonio. I think it was love not sense."

Prior to B and Laura's marriage, one note by Copley stated that Laura wanted to know what the children were getting under the estate plan. One letter summarizing certain estate planning documents had writing in the brown felt tip pen B traditionally used, but also had writing in a red pen. The jury could infer from the evidence and testimony that Laura had reviewed the document and made comments.

On a few occasions, B requested that Copley investigate whether the King Ranch royalties and a house in Cabo San Lucas could be left to his children, but subsequently called and stated that he changed his mind. The jury could infer that B changed his mind after discussions with Laura. With regard to the house in Cabo San Lucas, Laura testified that B immediately rejected Sarah's request that the house be left to the daughters/grandchildren for tax reasons; however, the evidence established that B asked Copley to research the issue and had not made an immediate decision. With regard to the King Ranch royalties, evidence was presented that B stated in a conversation with his children in 1999 that the King Ranch royalties were to be kept in the family, and that Laura, who overheard the discussion, stated she would never take a family heirloom. By 1999, however, the King Ranch royalties had been transferred to BKJ Interests, and under the estate plan, the King Ranch royalties would not remain in the family but would eventually be controlled by the foundation. Evidence was presented that in 2000 B again broached Copley with the idea of leaving the King Ranch royalties to the children. Copley sent an email regarding his conversation with B about this request in which Copley stated leaving the King Ranch royalties to the children "would require an audit of his estate, whereas, at the present time, it is a non-audit." At trial, however, Copley stated that a "slight chance" existed that leaving the King Ranch royalties to the children would enhance "the possibility of an audit." Moreover, in his letter to B regarding the manner in which such a transaction could be structured, Copley spent considerable time discussing the tremendous tax consequences of the transaction and concluded, "the tax cost is heavy." When Eastland was asked, however, whether there would have been "tax efficient ways" to transfer the King Ranch royalties to the children, he responded that there were, and he would never have told B not to leave the King Ranch royalties to the children. Moreover, evidence was presented from which the jury could find that Copley

represented Laura on several legal matters and could have a conflict of interest in providing advice that would result in assets being left to the children, thereby diminishing the assets in the life estate left to Laura.

Laura also retained the family scrapbooks and photo albums, claiming that B did not want Ceci and Sarah to have them until after Patsy died; however, the evidence established that Laura did not return the family scrapbooks and photo albums even after Patsy died, but kept possession of them for the duration of the trial. Evidence also was presented that Laura refused to give B's granddaughter, Alice, a silver spoon set that B wanted her to have. Although Laura testified that the attorneys had told her not to give away any of the estate assets because of the pending litigation, evidence established that she gave items belonging to the estate to other non-family members.

Prior to meeting Laura, B was an avid hunter and often hunted with his children and grandchildren. As the book on B's life stated, "B lived to hunt." After meeting Laura, B rarely hunted. In one of his notes to his employee Madeleine Sandefur, B stated that dove hunting continued to be a problem for Laura. B was scheduled to hunt on property belonging to his ranch manager, Claude Johnson; however, the hunt did not occur after Claude expressed his concerns about offending Laura. Although B issued a press release and was quoted in a newspaper saying that he purchased Black Creek Ranch intending to continue its commercial hunting operations, to continue the tradition of South Texas hunting, and to hunt with his grandchildren, no hunting was permitted on Black Creek after the first year's commercial commitments were fulfilled. Although Laura testified that B and she agreed before Black Creek was purchased to end the hunting, Laura's testimony was inconsistent with the newspaper

accounts of B's remarks. Moreover, a passage in the book about B's life also states Laura put an end to the hunting.

B had expressed to Ceci that he was glad Laura was older and would not want children. The record contains evidence that B underwent sperm testing in 1995 prior to his marriage to Laura. Laura subsequently underwent in vitro fertilization. The evidence was conflicting as to whether at some point Laura became pregnant. Laura testified that home pregnancy tests taken in November of 1998 showed that she was pregnant. Although Laura subsequently went to a hospital to be checked, the testing did not show anything in her uterus, but a hormone that becomes elevated during pregnancy was in fact elevated. There was some suggestion, however, that the elevated level could have been caused by the in vitro procedure. When B called Ceci and Sarah to tell them they lost a baby, Ceci and Sarah were shocked and reacted negatively. Ceci sent a letter apologizing, which Ceci testified would normally reopen communications. The evidence contained a letter that B had drafted accepting the apology; however, the letter that was actually sent did not accept the apology.[1] Only after a letter was written specifically apologizing to Laura was communication reopened. Sarah testified that when she met B in his office after this incident, B told her that he did not want to have a child, but Laura insisted.

One expert testified that relationship poisoning can be a tool to unduly influence a person, including making negative remarks about a person's children and re-interpreting historical events in a negative manner. Although several people were interviewed for the book about B's life, Ceci, Sarah, and Hager were not interviewed. Instead, Laura was extensively

---

[1] The letter that was sent stated, "Both Laura and I are truly sad that our choices and decisions in our life together have not pleased you. But they remain our choices, our decisions, and this is our life." The draft letter stated, "We are both sad that our choices and decisions in our life together have not pleased you but they remain our choices, our decisions, and this is our life. My suggestion is that we drop this issue and concentrate on all the things that make us love each other in the first place, the joy of being together and watching a whole new generation growing up before our very eyes."

interviewed about events that occurred before she met B. The book contained a suggestion that Kley had committed suicide based on Booth's interview of Laura; however, Laura had no proof that Kley committed suicide, and other evidence established that he was killed in a car accident, likely driving while intoxicated. In the early 1990's, before B met Laura, B was having financial trouble; B and Laura's interviews for the book conflict as to whether Ceci and Sarah knew of the extent of the financial trouble. Laura said they did; B said they did not. B sold the Chaparrosa ranch to alleviate the financial trouble. The childrens' trusts, which also owned an interest in the ranch, sued B because the sales agreement had money going to J.P. Morgan before the trusts, and the trustees did not believe the trusts were receiving the amount they were entitled to receive from the sale. Laura stated in an interview that Ceci and Sarah filed the lawsuit to bury B financially; however, B had stated Ceci and Sarah did not know the extent of his financial trouble. The jury could consider Laura's reinterpretation of these historical events in a negative manner as evidence of relationship poisoning.

The jury also heard evidence that Laura made negative remarks about Ceci and Sarah. Laura's friend, Reverend Zbinden, was interviewed by Booth and stated Laura had told him that Ceci and Sarah were greedy and ungrateful. During his deposition, Reverend Zbinden testified it was not unusual for Laura to speak negatively of Ceci and Sarah. Laura told Copley in a telephone conversation that Sarah was vile, not smart, and had the attention span of a gnat. Based on the evidence presented, the jury could infer that Laura also spoke negatively of Ceci and Sarah to B.

Having reviewed the record, we conclude the evidence is legally and factually sufficient to support a finding that undue influence existed and was exerted.

### 3. No Execution "But For" the Influence

"Finally, the establishment of the fact that the testament executed would not have been executed but for such influence is generally predicated upon a consideration of whether the testament executed is unnatural in its terms of disposition of property." *Rothermel*, 369 S.W.3d at 923. During oral argument, the Appellants placed great emphasis on one sentence in this court's decision in *Estate of Davis v. Cook*, 9 S.W.3d 288 (Tex. App.—San Antonio 1999, no. pet.). In that case, when describing a jury's consideration of unnatural disposition, we stated, "In this respect, only where *all reasonable explanation for the devise is lacking* may the trier of facts consider the disposition as evidence of disorder or lapsed mentality." *Id.* at 294 (emphasis added). Based on the italicized portion of this statement, the Appellants argued that the standard of review for no-evidence claims in undue influence cases is different than in other types of cases. In short, Appellants contend the evidence could not support a finding of undue influence because evidence was presented establishing a reasonable explanation for B's disposition of his estate. We cannot accept Appellants' interpretation of the quoted portion of the *Davis* opinion because it ignores the standard of review established by the Supreme Court in *City of Keller v. Wilson*, 168 S.W.3d 802, 827-30 (Tex. 2005), and establishes a totally different standard of review in undue influence cases. Tracing the source for the statement made in *Davis* reveals the fallacy of Appellants' position. The source for the statement in question is *Craycraft v. Crawford*, 285 S.W.3d 275, 278-79 (Tex. 1926), in which the court stated, "If all explanation be lacking, the trier of fact may take the circumstance as a badge of disordered or lapsed mentality or of its subjugation; if some explanation be advanced, the jury may pass upon its adequacy and attribute to the circumstance and its explanation such weight as may be thought proper, having in view all other relevant evidence." Accordingly, evidence of a reasonable explanation for an unnatural disposition does not prevent a jury from finding undue influence. Instead, where such

evidence is proferred, the jury must determine which explanation should be given more weight and which explanation is more credible. In this case, the jury disbelieved the explanation proffered by the Appellants in finding undue influence.

Considering whether the disposition was unnatural, we must consider evidence of B's stated desires and actions. The evidence established that B made several comments about the interest in the Hyatt being passed to the children/grandchildren. Similarly, evidence established that B was very proud of his heritage and wanted his descendants to inherit the King Ranch royalties. The majority interest in both of those assets, however, was not inherited by the grandchildren. Instead, Laura initially would benefit from the income from those assets during her life, and the interest would then pass to the foundation. Although the Appellants contend Laura did not receive any greater interest in B's estate than B's prior wives, the inclusion of the majority interest in these two assets in Laura's life estate greatly increased its value and was contrary to evidence that B wanted his descendants to inherit those assets. All of the estate planning documents that the jury found were the result of undue influence were executed after the dissolution of Johnson Properties and in connection with the creation of BKJ Interests.

Perhaps more importantly, the 1997 Management Trust expressly lists five charities as the remainder beneficiary after Laura's life estate consistent with the charities B had listed in his prior documents, which included: (1) United Way of San Antonio & Bexar County; (2) Cornell University; (3) National Cowboy Hall of Fame; (4) Trinity University; and (5) Trustees of Deerfield Academy. The evidence established that B had strong ties with these five charities. The documents found to be the product of undue influence eliminate a mandatory distribution to these favored charities. Instead, the remainder beneficiary after Laura's life estate became a perpetual foundation. Although the trust document listed charities that B wanted to be the

primary focus of distributions from the foundation, the trustee of the foundation had complete control over the selection of the charities that would benefit from foundation distributions. In addition, the list excluded the National Cowboy Hall of Fame with which B had strong ties, but included a foundation with which B had no ties and which Eastland admitted was mistakenly included. Finally, the list included "[a]ny other organization benefiting conservation, environmental causes, protection of animals, [and] protection of nature or the environment," which described causes supported by Laura, not B. Similarly, the remainder beneficiary of the grandchildren's trust under the 1997 trust document are the five charities B selected, as opposed to the foundation which was the remainder beneficiary in the 1998 trust documents.

The evidence presented was legally and factually sufficient to support a finding that the wills and trusts rejected by the jury would not have been executed but for the undue influence.

### D. Conclusion

The evidence is legally and factually sufficient to support the jury's finding of undue influence.

ATTORNEYS' FEES

### A. The Appellants' Claims

The Appellants raise numerous challenges to the attorneys' fee award. With regard to the award of attorneys' fees relating to the will contest, the Appellants contend: (1) Question 13A in the jury charge allowed the recovery of attorneys' fees by plaintiffs who were not eligible to recover the fees; (2) Question 13A of the jury charge allowed the recovery of attorneys' fees which the plaintiffs did not pay or incur; and (3) by allowing the jury to consider and include attorneys' fees that were not recoverable, the jury charge contained harmful error.

With regard to the award of attorneys' fees relating to the trust contest, the Appellants contend Question 13B allowed the recovery of attorneys' fees by plaintiffs who did not contest the trust, and by commingling plaintiffs who could and could not recover, the jury charge contained harmful error.

The Appellants also contend the evidence is legally insufficient to support the attorneys' fee award, claiming there is a lack of testimony regarding the necessary segregation of the fees. Appellants claim the trial court erred in awarding $540,000 in expenses as part of the attorneys' fee award, and that the total amount of the award constitutes an impermissible double recovery of fees. Finally, the Appellants assert the trial court erred in rendering judgment against the Estate for attorneys' fees incurred in pursuing the trust contest claims.

**B. The Jury Charge**

The jury was asked the following questions in the court's charge relating to the issue of attorneys' fees:

QUESTION NO. 11:

Do you find from a preponderance of the evidence that the following plaintiffs prosecuted any of their applications to probate of any of the Wills or Codicils dated from February 27, 1958 through July 24, 1995 in good faith and with just cause, whether successful or not?

For each of the following Plaintiffs answer "Yes" or "No":

a. Sarah ("Sarita") Spohn Kleberg Pitt, Individually      <u>Yes</u>

b. Sarah Spohn Kleberg Pitt as next friend of Stephen McCarthy Pitt, Jr., Allegra Elizabeth McCarthy Pitt, Harry Bennett McMurray, Belton Kleberg McMurrey, and Estella Lewis McMurrey      <u>Yes</u>

c. Alice Trueheart Johnson, Individually      <u>Yes</u>

d. Alice Trueheart Johnson, as next friend of          Yes
   Henry Kleberg Johnson

QUESTION NO. 12:

Do you find from a preponderance of the evidence that the following Plaintiffs prosecuted any of their applications to probate any of the Wills or Codicils dated from February 27, 1958 through September 27, 1993 in good faith and with just cause, whether successful or not?

For each of the following Plaintiffs answer "Yes" or "No":

a. Sarah Spohn Johnson Pitt          Yes

b. Cecilia Johnson McMurrey          Yes

Questions 13A and 13B of the jury charge asked the jury as follows:
QUESTION NO. 13A

What do you find from a preponderance of the evidence are the reasonable and necessary fees and expenses for the services of Plaintiffs' attorneys in connection with prosecuting their application to probate the wills or codicils dated February 27, 1958 through July 24, 1995, stated in dollars and cents?

Answer with an amount, stated in dollars and cents, if any.

    a. For preparation and trial.          Answer: $3,150,646

    b. For an appeal to the Court          Answer: $300,000
       of Appeals:

    c. For preparing or responding to
       a petition for review in the Supreme
       Court of Texas:          Answer: $100,000

    d. For briefing and oral argument in
       the Supreme Court of Texas:          Answer: $50,000

QUESTION NO. 13B

What do you find from a preponderance of the evidence are the reasonable and necessary fees and expenses for the services of Plaintiffs' attorneys in connection with prosecuting the contest of the Trusts, referred to in Question 3, stated in dollars and cents?

Answer with an amount, stated in dollars and cents, if any.

    a.  For preparation and trial.                     Answer: <u>$3,150,646</u>

    b.  For an appeal to the Court            Answer: <u>$300,000</u>
        of Appeals:

    c.  For preparing or responding to
        a petition for review in the Supreme
        Court of Texas:                       Answer: <u>$100,000</u>

    d.  For briefing and oral argument in
        the Supreme Court of Texas:      Answer: <u>$50,000</u>

Based on the jury's findings, the trial court's judgment awarded the Appellees $6,301,292 in attorneys' fees and expenses for preparation and trial of the will and trust contests.

## C. Texas Probate Code § 243

The Appellants contend the trial court erred in submitting Question 13A of the charge because it allowed the jury to consider fees for legal services provided to plaintiffs who are ineligible to recover attorneys' fees under section 243 of the Texas Probate Code. Section 243 of the Probate Code makes provision for the payment of expenses and disbursements, including attorneys' fees, to certain classifications of individuals who incur them while defending or prosecuting a will. The statute expressly provides:

> When any person designated as executor in a will or an alleged will, or as administrator with the will or alleged will annexed, defends it or prosecutes any proceeding in good faith, and with just cause, for the purpose of having the will or alleged will admitted to probate, whether successful or not, he shall be allowed out of the estate his necessary expenses and disbursements, including reasonable attorney's fees, in such proceedings. When any person designated as a devisee, legatee, or beneficiary in a will or an alleged will, or as administrator with the will or alleged will annexed, defends it or prosecutes any proceeding in good faith, and with just cause, for the purpose of having the will or alleged will admitted to probate, whether successful or not, he may be allowed out of the estate his necessary expenses and disbursements, including reasonable attorney's fees, in such proceedings.

TEX. PROB. CODE ANN. § 243 (West 2003). From the plain language of the statute, persons designated as devisees, legatees, or beneficiaries who defend or prosecute a will admitted to probate in good faith may recover their attorneys' fees. *Id.*

"A trial court has wide discretion in submitting . . . jury questions." *Moss v. Waste Mgmt. of Tex., Inc.*, 305 S.W.3d 76, 81 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review an allegation of jury charge error for an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex. 1990). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). For an appellate court to reverse on the basis of charge error, the appellant must show the error was harmful. *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pet. denied).

The Appellants contend Question 13A improperly "allowed the jury to include in its finding attorneys' fees which the eligible plaintiffs did not pay or incur." We are not persuaded by this contention because "proof of fees actually incurred or paid [is] not [a] prerequisite[] to the recovery of attorney's fees in Texas." *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 520 (Tex. App.—Fort Worth 2009, no pet.). Moreover, the record shows the jury was presented with testimonial and documentary evidence establishing that the individual plaintiffs incurred attorneys' fees based upon an hourly rate, which they contractually agreed to pay to their respective attorneys. Although the individual plaintiffs did not personally pay or advance payment for their respective attorneys' fees, the record shows that certain trusts, created for the benefit of the individual plaintiffs, paid or advanced payment for such fees.[2] The

---

[2] The trustees apparently paid the attorneys' fees as trust expenses.

Appellants fail to cite any case law demonstrating that the manner in which the attorneys' fees were paid or advanced in this case somehow precludes the Appellees from recovering their attorneys' fees under section 243. *See generally In re Ray Ellison Grandchildren Trust*, 261 S.W.3d 111, 127 (Tex. App.—San Antonio 2008, pet. denied) ("The Trustees have cited no authority for the proposition that it is unequitable and unjust to award attorney's fees to parties who have had their fees paid up front by another party, subject to reimbursement."). Consequently, we reject the Appellants' contention.

The Appellants next complain that the wording of Question 13A was incorrect because it allowed "the jury to include fees for services provided to plaintiffs who are not eligible to recover fees under Section 243." As previously noted, Question 13A asked the jury to determine "the reasonable and necessary fees and expenses for the services of Plaintiffs' attorneys in connection with prosecuting their application to probate the wills or codicils dated February 27, 1958 through July 24, 1995." Question 13A was not conditioned upon an affirmative response by the jury to any part of Questions 11 or 12, which asked the jury to determine whether the named plaintiffs prosecuted "their applications to probate of any of the Wills or Codicils . . . in good faith and with just cause." The Appellants argue that by not conditioning the charge, the wording of Question 13A improperly allowed the jury to consider the fees incurred by Hager and the trustee plaintiffs, who are ineligible to recover attorneys' fees under section 243 because they lack any good faith findings.

While the jury charge submitted by the trial court would have been more definitive had the attorneys' fees question been conditioned upon an affirmative response by the jury to any part of the "good faith" questions, we cannot say the charge is erroneous under the facts of this case. As written, Question 13A necessarily precludes the jury from considering the fees incurred

by Hager and the trustee plaintiffs because it limits the jury's consideration to the fees incurred by only those plaintiffs who prosecuted an application to probate a will or codicil "dated February 27, 1958 through July 24, 1995." It is undisputed that neither Hager nor the trustee plaintiffs ever prosecuted any wills or codicils during the underlying proceedings. All of the persons who filed an application for probate were listed under Questions 11 and 12 of the charge and were found to have acted in good faith and with just cause by the jury. Assuming the jury answered the question put to them, *see Phillips v. Phillips*, 820 S.W.2d 785, 787 n.2 (Tex. 1991) ("We must assume that the jury followed the trial court's instructions and answered the question put to them."), the jury's answer to Question 13A could not include any fees relating to Hager or the trustee plaintiffs because they did not prosecute an application to probate a will or codicil dated "February 27, 1958 through July 24, 1995."

The Appellants further complain that Question 13A improperly allowed the jury to consider the fees incurred by B's grandchildren because they were not designated as devisees, legatees, or beneficiaries in the referenced wills as required by section 243. The grandchildren, however, are beneficiaries of testamentary trusts created under the wills and are direct beneficiaries or legatees under at least two of the wills that they offered for probate. Accordingly, the grandchildren have the right to recover their attorneys' fees under the Probate Code. We conclude that Question 13A is not defective, and we therefore reject the Appellants' complaint.

### D. Texas Trust Code § 114.064

The Appellants contend the trial court erred in connection with its submission of Question 13B of the charge. This issue involves section 114.064 of the Texas Trust Code, which authorizes the recovery of attorneys' fees in a trust action. Section 114.064 provides: "In any

proceeding under this code the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just." TEX. PROP. CODE ANN. § 114.064 (West 2007). An award of attorneys' fees under this section "is within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's judgment absent a clear showing that the trial court abused its discretion by acting without reference to any guiding rules and principles." *Hachar v. Hachar*, 153 S.W.3d 138, 142 (Tex. App.—San Antonio 2004, no pet.); *see Lee v. Lee*, 47 S.W.3d 767, 793-94 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

First, the Appellants argue that because the attorneys' fees were paid for by the trusts created for the benefit of the individual plaintiffs, as opposed to being paid by the individual plaintiffs themselves, the Appellees are not entitled to attorneys' fees under the statute. According to the Appellants, it is not equitable or just to award fees to parties who do not personally incur fees. The Appellants have cited no authority for the proposition that it is unequitable and unjust to award attorneys' fees to parties who have had their fees paid or advanced by another. *See In re Ray Ellison Grandchildren Trust*, 261 S.W.3d at 127. Given that proof of fees actually incurred or paid is not a prerequisite to the recovery of attorneys' fees in Texas, *see AMX Enters., L.L.P.*, 283 S.W.3d at 520, we must reject the Appellants' contention.

Second, the Appellants argue the wording of Question 13B improperly permitted the jury to award attorneys' fees to plaintiffs who never contested the trusts at issue. Question 13B asked the jury: "What do you find from a preponderance of the evidence are the reasonable and necessary fees and expenses for the services of Plaintiffs' attorneys in connection with prosecuting the contest of the Trusts, referred to in Question 3, stated in dollars and cents?" The plain wording of Question 13B, however, does not support the Appellants' contention because it

expressly limits the jury's consideration to the fees and expenses actually incurred in "prosecuting the contest of the Trusts." Assuming the jury followed the plain wording of Question 13B, *see Phillips*, 820 S.W.2d at 787 n.2, its answer does not include any fees relating to any non-trust claims or plaintiffs who did not contest the trusts. The Appellants' argument thus lacks merit.

### E. Sufficiency of the Evidence

The Appellants also contend the evidence is legally insufficient to support the attorneys' fee award. Because the Appellants are challenging the legal sufficiency of the evidence to support a finding on which they did not have the burden of proof at trial, the Appellants must demonstrate on appeal that no evidence exists to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, No. 05-1076, 2009 WL 795668, at *6 (Tex. Mar. 27, 2009); *Brockie v. Webb*, 244 S.W.3d 905, 909 (Tex. App.—Dallas 2008, pet. denied). When reviewing the record, we look to see whether any evidence supports the challenged finding. *Brockie*, 244 S.W.3d at 909. In reviewing the reasonableness of an award of attorney's fees, the reviewing court should consider: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997); *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 240-41 (Tex.

App.—San Antonio 2001, pet. denied). A trial court is not required to consider all of the factors in every case because the factors are simply guidelines for the trial court to consider, not elements of proof. *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 567 (Tex. App.— Austin 2004, no pet.); *Academy Corp. v. Interior Buildout & Turnkey Constr., Inc.*, 21 S.W.3d 732, 742 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

In *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006), the Supreme Court reaffirmed the general rule requiring segregation of attorneys' fees. The Court held that intertwined facts underlying claims for which attorney's fees are recoverable and unrecoverable do not excuse a party from segregating fees between claims—"it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313-14; *see Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) (per curiam) (stating *Chapa* holds "a prevailing party must segregate recoverable from unrecoverable attorney's fees in all cases"). Thus, the general duty to segregate fees applies unless a party meets its burden of establishing that the same discrete legal services were rendered with respect to both a recoverable and unrecoverable claim. *Chapa*, 212 S.W.3d at 313-14; *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 455 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "Whether and the extent to which attorney's fees can be segregated, is a mixed question of law and fact, and if segregation is possible, remand is required." *Osborne v. Jauregui, Inc.*, 252 S.W.3d 70, 76 (Tex. App.—Austin 2008, pet. denied).

James J. Hartnett, Jr. was the only attorney to testify regarding the Appellees' attorneys' fees. The underlying trial began in February of 2007. By the beginning of trial, the Appellants had incurred $8,570,150.93 in attorneys' fees and expenses; however, that amount did not include the attorneys' fees incurred by BKJ Interests or two of the attorneys representing Laura.

Hartnett testified that his opinion regarding the reasonableness of the attorneys' fees took into consideration the attorneys' fees incurred by the Appellants and all of the attorneys' fee bills.[3] He also indicated that he considered many factors when assessing the reasonableness of the fees in this matter, including: (1) the time and labor expended and the complexity of the matter; (2) the fees in the location where the case was tried; and (3) the experience, reputation, and ability of the lawyers performing the services.

Hartnett stated he has been licensed since 1983 and approximately 90-95% of his work is in probate, trust, and fiduciary-related litigation. Jack Lawter has been licensed since 1981 and has focused on the same type of work over his career. Dianne Lawter was licensed in 1989.

Hartnett described the case as complex, noting the case was filed in May or June of 2003 but not tried until 2007. Hartnett had been involved in only two other cases that had taken as long to get to trial. Hartnett testified that the matter was as vigorously contested as any matter with which he had been involved, noting there were numerous hearings, pleadings, and depositions. Hartnett also noted the increased workload due to the number of attorneys involved and due to the intervention of BKJ Interests in the proceeding.

The document production in the case filled 600 boxes, not including the electronic discovery, which Hartnett described as "significant." Over forty depositions were taken, and several of them were two-day depositions. Four separate mediations were conducted. The attorneys disagreed and had hearings on many discovery matters, including the production of documents, whether a deposition would be taken, and time limits on depositions. Hartnett stated that they had been involved in "innumerable hearings" in which 20 motions would be scheduled and could carry over into the next day.

---

[3] The trial court's judgment awards Copley $4,312,777 for defending the wills in good faith. This award is not challenged on appeal.

Hartnett testified that Jack Lawter's rate started at $375 per hour and rose to $475 per hour. Dianne Lawter initially charged $300 per hour, and her fee rose to $400 per hour. The rates for Hartnett and one other member of his firm started at $300 per hour and rose to $350 per hour. The rates for the other members of his firm were $250 per hour. Hartnett then compared those rates to the rates charged by the Appellants' attorneys which ranged from $375 per hour to $485 per hour. He noted that one of the paralegals for the Appellants billed as high as $180 per hour.

Hartnett stated the Lawters' fees and expenses through April 2007 totaled $5,032,938.73. Hartnett testified that the bills for his firm through December of 2006 totaled $994,714.68. Including an estimated amount of unbilled fees through trial of $1,500,000, he further testified that the total fees would be $6,532,938.73. He stated that fee was reasonable given the complexity of the case and "all of the moving parts and number of people and the amount of time that's expended and the amount of preparation."

With regard to segregation, Hartnett testified that almost all of the legal fees were incurred in advancing the will contest, estimating that 95% of the total fees were incurred in relation to the will contest and trust contest claims or approximately $6,301,291.80. Hartnett explained that the work required on the claims relating to the dissolution of Johnson Properties was also tied to the undue influence claims because the dissolution was evidence of the undue influence. Based on his experience in prosecuting claims for breach of fiduciary duty, Hartnett estimated that the breach of fiduciary claim against J.P. Morgan relating to the 1998 Family Trust would be $250,000. He further testified that the legal service or work done in connection with the tortious interference claim was included in the work done in connection with the will contest, in particular the undue influence allegation.

Hartnett's testimony provided the jury with sufficient evidence to support an award of $6,301.292 for attorneys' fees. In light of the record before us, we reject the Appellants' sufficiency challenge and overrule their appellate complaint.

## F. Inclusion of Expenses

The Appellants contend the trial court erred in including $540,000 in expenses in the attorneys' fee award because only costs and not expenses are recoverable under section 114.064 of the Texas Trust Code. *See* TEX. PROP. CODE ANN. § 114.064 ("In any proceeding under this code the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just."). The Appellees note, however, that the Appellants failed to object to Question No. 13B, which permitted the jury to award expenses in connection with the contest of the trusts. *See* TEX. R. CIV. P. 274 (complaint as to question in jury charge waived absent objection). We agree with the Appellees that this complaint is waived because the Appellants failed to object below. Moreover, the jury's answer did not expressly include an amount for expenses in relation to the trust contest, and we note the expenses were recoverable in relation to the will contest. *See* TEX. PROB. CODE ANN. § 243 (providing for recovery of necessary expenses in will contest).

## G. Double Recovery of Attorneys' Fees

The Appellants next argue there is a double recovery of attorneys' fees by the Appellees. The judgment shows the Appellees were awarded $6,301,292 in attorneys' fees. The Appellants assert the trial court "arrived at its award by taking the $3,150,646 found by the jury for the attorneys' fees for the will contest (Question 13A) and adding it to the $3,150,646 for the attorneys' fees found for the trust contest." They argue the trial court should not have combined the jury's findings for the will and trust contest because it amounts to a double recovery of

attorneys' fees. The Appellants' assertion that the Appellees received a double recovery is without merit.

The record shows the Appellees raised two causes of action for which they could recover their attorneys' fees: (1) a will contest/application claim, *see* TEX. PROB. CODE ANN. § 243; and (2) a trust contest claim. *See* TEX. PROP. CODE ANN. § 114.064. The charge thus asked the jury to provide findings as to the attorneys' fees incurred by the Appellees for their prosecution of the will contest/application separate and distinct from the fees they incurred prosecuting their trust contest. Although the jury determined a reasonable and necessary fee for the prosecution of each claim was the same ($3,150.646), the jury heard testimony from Hartnett that the fees for the will and trust contests were "identical," and that the total amount of fees incurred was in excess of $6,300,000. The attorneys' fees award is consistent with Hartnett's testimony, and we cannot conclude the Appellees received a double recovery of their attorneys' fees.

## H. Award of Trust Contest Fees Against Estate

The Appellants' final argument is that the trial court erred in rendering judgment against the Estate for attorneys' fees incurred in pursuing the trust contest claims. The Appellants contend the Estate was not a party to the trust contest claim. Under section 114.064 of the Texas Trust Code, a trial court has the discretion to make an award of attorneys' fees in a trust contest case "as may seem equitable and just." *Id.* We review such an award under an abuse of discretion standard. *Hachar*, 153 S.W.3d at 142.

The Appellants' contention ignores that all of the claims were jointly tried together, and the management trusts were part of the overall estate plan. In order to defend the wills, the executor necessarily was required to defend the management trusts. Because defense of the will

necessarily required defense of the trust, the trial court's award of the attorneys' fees against the Estate was equitable and just. We therefore reject the Appellants' contention.

## CONCLUSION

After full consideration of the Appellants' claims, we conclude the record supports the jury's finding that Belton Kleberg Johnson executed certain wills and trusts as a result of undue influence. Likewise, the jury's award of attorneys' fees is supported by the record evidence. The trial court properly rendered judgment on the jury's verdict. Accordingly, we affirm the judgment of the trial court.

Catherine Stone, Chief Justice