

**NUMBER 13-11-00462-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE ESTATE OF MARGARET CAMERON BOLTON CLIFTON, DECEASED

### On appeal from the County Court at Law No. 2 of McLennan County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Justice Garza

This case involves a judgment notwithstanding the verdict entered in a will contest. Appellant, Elizabeth Stadele ("Elizabeth"), contested the June 2004 will of her mother's half-sister, Margaret Cameron Bolton Clifton ("Margie"), claiming that it was procured by the undue influence of Margie's niece, appellee Linda Reichenbach ("Linda"). Appellee Wells Fargo Bank, N.A. ("Wells Fargo") was the independent executor under the will. After a jury found in favor of Elizabeth, the trial court granted

motions for judgment notwithstanding the verdict filed by appellees. Elizabeth argues by two issues that the trial court erred. We affirm.

## I. BACKGROUND

Margie was one of three children born to Edward Cameron Bolton and Mary Lyle Staton. Bolton had another child with a second wife; that child, Catherine Ross Bolton ("Catherine"), is Elizabeth's mother. Linda is the daughter of Mary Staton Bolton, Margie's sister. Thus, Linda is Margie's niece and Elizabeth is Margie's half-niece.

Elizabeth and her family enjoyed a close relationship with Margie for several decades. Around 2003, Margie became closer to Linda and, according to Elizabeth, became "convinc[ed]" that Elizabeth and her family "never loved Catherine" and "were treating her unkindly." Meanwhile, Margie was diagnosed with cancer. In June 2004, Margie executed a will that left most of her estate to Linda, and nothing to Elizabeth.

Margie died in June 2007. On October 3, 2007, the probate court rendered an order probating the June 2004 will and appointing Wells Fargo as the independent executor of the estate. Subsequently, Margie's son, Cameron Nind Hopkins ("Cameron"), filed an application to set aside the October 3, 2007 order. Cameron alleged as follows:

> [T]he Will was executed as a result of undue influence exerted over the Deceased by [Linda]. Influence existed and was exerted by [Linda] over the Deceased that effectively operated to subvent [sic] or overpower the mind of the Deceased at the time of the execution of the Will. As a result of such undue influence, Deceased executed an instrument, the Will, which she would not otherwise have executed but for such influence. [Linda] engaged in conduct intended to ingratiate herself to the Deceased for the sole purpose of having Deceased disinherit [Cameron] and leave her estate to a niece rather than to the natural object of Deceased's bounty. . . . Further, such undue influence was exerted at a time during which Deceased was of advanced age, was suffering from the effects of a catastrophic car accident earlier in life which left Deceased mentally

2

unstable, and was emotionally retarded due to a personality disorder. Deceased was unable to resist the methodical and systematic acts of [Linda] by which [Linda] ingratiated herself to Deceased and overcame Deceased's ability to resist the type and extent of the influence exerted.

Elizabeth subsequently intervened in the proceedings and reiterated Cameron's allegations regarding Linda's undue influence. In her second amended petition, Elizabeth further noted that Margie had executed previous wills in 1993, 1995, 2000, and March 2004, and that each of the previous wills included Elizabeth as a beneficiary. Elizabeth asked the trial court to vacate its October 3, 2007 order and instead probate one of the previous wills. Wells Fargo and Linda filed answers denying the allegations of undue influence. Cameron non-suited his claims in March 2011. Elizabeth remained as a will contestant.

After a trial, a jury found in favor of Elizabeth. Both Linda and Wells Fargo filed motions for judgment notwithstanding the verdict, contending that there was not more than a scintilla of evidence supporting Elizabeth's claims. The trial court, after accepting additional briefing and conducting a hearing, granted the motions and rendered judgment denying Elizabeth's will contest. This appeal followed.[1]

## II. DISCUSSION

### A.    Judgment Notwithstanding the Verdict

By her first issue, Elizabeth contends that the trial court erred in granting the motions for judgment notwithstanding the verdict because there was legally sufficient evidence to support the jury's verdict.

####    1.    Standard of Review

---

[1] This appeal was transferred from the Tenth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

3

In reviewing a trial court's judgment notwithstanding the verdict, we conduct a legal sufficiency analysis of the evidence, which is the same test applied to appellate no-evidence challenges. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). We will uphold the judgment if there is no evidence of at least one essential element of the plaintiff's claim. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). We consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

### 2. Applicable Law

To establish undue influence, the contestant must show: (1) the existence and exertion of influence; (2) the operation of that influence so as to subvert the will or overpower the mind of the grantor at the time of the execution; and (3) the execution of an instrument the maker would not have executed but for such influence. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). There must be some evidence to show that the influence was not only present, but was exerted with respect to making the instrument. *Id.*; *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied). Mere requests or efforts to execute a favorable instrument are not sufficient to establish undue influence unless the requests or efforts are so excessive so as to

4

subvert the will of the maker. *Curry v. Curry*, 153 Tex. 421, 270 S.W.2d 208, 212 (Tex. 1954).

Undue influence may be proven by circumstantial, as well as direct, evidence. *See Rothermel*, 369 S.W.2d at 922; *In re Estate of Olsson*, 344 S.W.2d 171, 173-74 (Tex. Civ. App.—El Paso 1961, writ ref'd n.r.e.) ("More often than not, undue influence is impossible to establish by direct proof, and may only be shown by circumstances."). When determining a claim of undue influence, it is proper to consider all evidence of relevant matters that occurred within a reasonable time before or after the will's execution. *Watson v. Dingler*, 831 S.W.2d 834, 837 (Tex. App.—Houston [14th Dist.] 1992, writ denied). In particular, fact-finders should consider the following ten factors when determining the existence of undue influence:

(1)   the nature and type of relationship existing between the testator, the contestants, and the party accused of exerting such influence;

(2)   the opportunities existing for the exertion of the type or deception possessed or employed;

(3)   the circumstances surrounding the drafting and execution of the testament;

(4)   the existence of a fraudulent motive;

(5)   whether there had been a habitual subjection of the testator to the control of another;

(6)   the state of the testator's mind at the time of the execution of the testament;

(7)   the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted;

(8)   words and acts of the testator;

5

(9) weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise;

(10) whether the testament executed is unnatural in its terms of disposition of property.

*In re Estate of Graham*, 69 S.W.3d 598, 609–10 (Tex. App.—Corpus Christi 2001, no pet.) (citing *Rothermel*, 369 S.W.2d at 923).

The first five factors as elucidated in *Rothermel* and *Graham* address the first element of undue influence (i.e., whether such influence existed and was exerted with respect to the testament at issue); the next four factors concern the second element (i.e., whether the testator's will was subverted or overpowered by such influence); and the tenth factor is relevant to the third element (i.e., whether the testament would have been executed but for such influence). *See Rothermel*, 369 S.W.2d at 923.

### 3.    Existence and Exertion of Undue Influence

We will begin by examining the factors set forth in *Rothermel* and *Graham* that are relevant to the first element of undue influence.

> i.    *Nature and Type of Relationships Between Testator, Contestants and Party Accused of Undue Influence*

The evidence was undisputed that Margie enjoyed a close relationship with Elizabeth and her immediate family for many years. Margie first met Willard Brown ("Willard"), Elizabeth's father, in the 1960s when Willard was dating Catherine. Margie was close to the couple and became "very involved" in planning their wedding. In the 1980s, a "rift" developed between Margie and Willard due to unspecified financial issues.[2] By 1993, Margie had reconciled with Willard, Catherine, and their daughters.

---

[2] It was also around this time that Margie became estranged from her only child, Cameron, and disinherited him.

6

According to Willard, Margie frequently spent holidays with his family and often traveled with them during the 1990s and early 2000s. Additionally, at some point, Willard became involved in managing a trust that held the family's "fairly extensive" mineral interests. The relationship between Margie and Willard's family remained warm as recently as 2003, when Margie traveled from Texas to North Carolina to attend Elizabeth's college graduation. Margie's contemporaneous written correspondence to Elizabeth reflected this close relationship.

However, the nature of Margie's relationship with Elizabeth clearly changed in the latter years of Margie's life. Although Margie initially included Elizabeth and her sister Helen as beneficiaries in her 1993, 1995, 2000, and March 2004 wills, she sent a letter to her attorney in May 2004 in which she stated that "a lot of changes have happened concerning my two nieces [Elizabeth and Helen]" and gave instructions to omit them as will beneficiaries. The parties' dispute over why these "changes" came about is the crux of this lawsuit.

According to Linda, the changes in Margie's relationship with Elizabeth arose from the contentious divorce of Elizabeth's parents, Willard and Catherine. Willard testified that Catherine became psychologically unstable in the late 1990s[3] and that her condition precipitated their divorce, which Catherine initiated in 2001. Catherine also became estranged from her daughters; Willard testified that Catherine has not informed either daughter of her current address because "she thinks that Helen and Elizabeth hire private detectives to watch her all the time, and so she's somewhat in hiding." Correspondence from 2001 to 2003 showed that, despite her half-sister's divorce,

---

[3] Willard testified that Catherine believed that she was "psychically" responsible for the Texas A&M bonfire tragedy in 1999, and "she was concerned about some international conspiracy that was following her around, spying on her."

Margie initially maintained close contact with Willard, Helen, and Elizabeth. In fact, after the divorce was finalized, Willard moved to a house across the street from Margie and the two interacted often.

In addition to the divorce, however, other legal proceedings developed between Catherine and her estranged family. In 2002, Catherine sued Willard and Bank of America asserting, among other claims, breach of fiduciary duty. Catherine also sought to have her daughters removed as beneficiaries of the trust that was the subject of the litigation, and Elizabeth and Helen were joined as parties to the suit. In 2004, Catherine filed a second lawsuit against the successor trustee, Bank of Texas. In November 2004, Bank of Texas added Elizabeth and Helen as parties to the suit because of their status as beneficiaries. At some point in this litigation, Elizabeth and Helen prevailed on a $30,000 claim for attorney's fees against their mother.

Elizabeth and Willard proposed a different reason for the change in Elizabeth's relationship with Margie: they contended that the change arose from Linda's deceiving Margie into believing that Willard and his daughters did not love Catherine, and that they were treating Catherine unkindly. Willard testified that Elizabeth and Helen attempted to visit Margie during Thanksgiving in 2003, but that Margie became upset at them, accusing Willard of trying to take all of Catherine's money and accusing Elizabeth and Helen of not being kind to Catherine. According to Willard, Margie also accused Willard of marrying Catherine for her money and asserted that they never actually loved each other. Upon hearing of these accusations, Willard contacted Margie and told her she was mistaken. Willard testified that Margie was then "very apologetic and said she thought she had been getting wrong information from Linda."

8

Willard further testified that he called Margie in December 2003 to inform her that Elizabeth and Helen had asked their mother to celebrate her birthday with them but that Catherine declined. Willard stated:

> I told [Margie] that I didn't want the sort of misunderstanding to occur about her birthday that might have happened at Thanksgiving.
>
> And she replied that, you know, it was just that she was being told by Linda that the girls didn't love their mother or that they were treating her unkindly and those sorts of things. And I—I said, "Well, I can assure you they love her very much, but it would help if she would do a little bit to meet them halfway and to—to be lovable." . . . She said I, "Well, I think my sister is lovable, good-bye." It was very abrupt. . . . [S]he hung up prematurely.

As to Margie's relationship with Linda, the evidence reflects that it was almost always close. Though Linda was born and raised in France, she moved to Texas in the 1970s. Linda was Margie's only full-blooded niece and was the only relative of Margie who lived nearby to her in the years preceding her death. Elizabeth and Willard also testified that a dispute arose between Margie and Linda's mother in the 1970s regarding the family's mineral interests. Elizabeth and Willard also testified that Margie's relationship with Linda soured somewhat in the early 1990s, when Linda began a romantic relationship with a former student at Waco High School, where Linda was employed as a teacher. Willard testified that Margie was embarrassed by this relationship. It is undisputed, however, that Margie and Linda reconciled well before the execution of the testament at issue.

Finally, as to relationships between the contestants, Willard testified that he and his immediate family, including Elizabeth, had a cordial relationship with Linda and her immediate family up until the late 1990s or early 2000s. At that time, Willard informed

9

Linda's family that he would no longer be managing their mineral trust without compensation "because they were so very difficult to work with."

### ii. Opportunities for Exertion of Deception

There is no dispute that Linda was the only relative of Margie that lived nearby to her in the years preceding her death. The evidence was also uncontroverted that Margie was very close to Linda during the time immediately before the execution of the June 2004 will and that the two often spent time together. Dorothy Kendrick, who regularly played bridge with Margie, testified that Linda was "the person that was closest to [Margie]." Jeanette Mathias, who also played bridge with Margie, and Betsy Oates, one of Margie's friends, both stated that Margie was close only to Linda and her housekeeper Gloria.[4] Another friend of Margie, Jack Burgess, testified that Linda was the only person with whom Margie had a close relationship. This evidence, although not necessarily probative as to whether Linda actually exerted undue influence upon Margie, established that the opportunity for such exertion did exist.

### iii. Circumstances Surrounding Drafting and Execution of Testament

The June 2004 will was drafted by attorney Meredith Cawthron, who was also Linda's attorney. Cawthron testified that Margie wrote a letter explaining the changes she desired to make to her will—i.e., the exclusion of Elizabeth and Helen as beneficiaries—and that Margie came to her office alone to discuss the changes and to execute the will. Linda was not present at any time during the process. Cawthron stated that she briefly discussed the proposed revisions to the will with Margie before having her execute the testament. Cawthron had no reason to believe that Linda, or anyone else, had exerted any undue influence on Margie with respect to the will. No

---

[4] The June 2004 will included a cash bequest of $400,000 to Gloria.

10

other witness testified as to the circumstances surrounding the drafting or execution of the June 2004 will. This evidence does not support a finding of undue influence.

### iv. Existence of a Fraudulent Motive

In arguing that there was evidence of a fraudulent motive on the part of Linda, Elizabeth states that "Margie's residuary estate was worth more than $2 million" and that "[t]he size of her estate alone is evidence of a fraudulent motive to exercise undue influence." In support of this assertion, Elizabeth cites *In re Estate of Fiedler*, No. 13-09-00386-CV, 2011 Tex. App. LEXIS 2856, at *11 (Tex. App.—Corpus Christi Apr. 14, 2011, no pet.) (mem. op.); *In re Estate of Johnson*, 340 S.W.3d 769, 778–83 (Tex. App.—San Antonio 2011, pet. dism'd); and *Peralez v. Peralez*, No. 13-09-00259-CV, 2010 Tex. App. LEXIS 4781, at *16 (Tex. App.—Corpus Christi June 24, 2010, pet. denied) (mem. op.). These cases do not support the proposition advanced by Elizabeth. In *Fiedler*, we stated that the existence of a fraudulent motive was "obvious" because the testator "left his entire estate to [appellant], a woman whom he had only met fifteen months prior to executing his will." 2011 Tex. App. LEXIS 2856, at *11. Margie, by contrast, had been close to Linda for decades. In *Peralez*, we found that there was some evidence of a fraudulent motive because appellant, the accused fraudster, "had given up his job, either to retire or for some other reason" and "was dipping into his 401k account to live." 2010 Tex. App. LEXIS 4781, at *16. That was not the case with respect to Linda, who was gainfully employed and was already included as a beneficiary of Margie's estate at the time Elizabeth was disinherited. More importantly, we did not state or imply in either *Fiedler* or *Peralez* that the size of the testator's estate in and of itself had any bearing on whether appellant had a motive

11

to commit fraud.  The *Johnson* court similarly did not discuss the size of the estate in determining whether a fraudulent motive existed.  *See Johnson*, 340 S.W.3d 769, 778– 83.  We do not find evidence of a fraudulent motive in this case.

> *v.*    *Habitual Subjection of the Testator to Control of Another*

There was no evidence adduced that Margie had been habitually subjected to the control of Linda or any other person.  Margie's bridge partners testified that Margie was independent and strong-willed up until the time of her death.  On the other hand, Willard and Elizabeth testified that Margie's apparent independence was only for public consumption and that privately, she could be dependent, needy, and emotional.  However, this testimony relates to whether Margie was susceptible to influence and does not establish that she was ever actually subject to another person's control.

### 4.    Analysis

The evidence established that Linda had the opportunity to influence Margie because they were very close in the time leading up to the drafting and execution of the June 2004 will, and Margie was isolated from other family members at the time.  However, "[t]he exertion of undue influence cannot be inferred by opportunity alone." *Cotten*, 169 S.W.3d at 827.  The only evidence adduced indicating that Linda actually exerted undue influence over Margie was Willard's testimony regarding his telephone conversations with Margie in November and December 2003.  Specifically, Willard testified that Margie told him that "she thought she had been getting wrong information from Linda" and that "she was being told by Linda that the girls didn't love their mother or that they were treating her unkindly and those sorts of things."[5]  We do not believe

---

[5] This testimony was hearsay, *see* TEX. R. EVID. 801, and does not appear to be admissible under any exception to the hearsay rule.  *See* TEX. R . EVID. 803, 804.  Nevertheless, we consider the testimony

12

this is sufficient evidence to establish the exertion of undue influence. Circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence. *In re Estate of Steed*, 152 S.W.3d 797, 810 (Tex. App.—Texarkana 2004, pet. denied). Here, we have concluded that the evidence did not show a fraudulent motive on the part of Linda; nor did it show that Margie was habitually subject to Linda's or anyone else's control; nor did it show that Linda played any role in the drafting or execution of the testament.[6] Additionally, though Elizabeth contends that "Margie['s] love and affection for Elizabeth's family changed almost overnight during the November-December 2003 time period," this does not account for why Margie's March 2004 will retained Elizabeth and Helen as beneficiaries.[7] It was only the June 2004 will that altered this disposition, and there was no evidence adduced that Linda exerted influence on Margie between March and June of that year. *See Rothermel,* 369 S.W.2d at 922; *Cotten*, 169 S.W.3d at 827 (noting that there must be some evidence to show that the influence was not only present, but was exerted with respect to making the instrument at issue). Rather, the evidence showed that Margie may have had her own independent motive to disinherit Elizabeth because Elizabeth and her sister joined in litigation against Catherine and obtained a $30,000 attorney's

---

in our analysis because no party objected to its admission at trial. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

[6] Elizabeth stresses the fact that the drafter of the will, Cawthron, was also Linda's attorney. If this fact is relevant at all to the issue of undue influence, it shows only that Linda had the opportunity to influence Margie, not that she actually did so. *See Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied) ("The exertion of undue influence cannot be inferred by opportunity alone.").

[7] The March 2004 will included bequests of jewelry, antiques, and other personal property to Elizabeth and Helen. It also contained a bequest of two-thirds of Margie's residual estate to a trust of which Elizabeth and Helen were the only beneficiaries.

13

fees judgment against her. On the evidence adduced at trial, the jury could have only merely surmised or suspected that Linda exerted undue influence as to the June 2004 will in particular. *See Jelinek*, 328 S.W.3d at 532.

We therefore conclude, viewing the evidence in the light most favorable to the jury's verdict, *see City of Keller*, 168 S.W.3d at 822, that there was no more than a mere scintilla of evidence showing that Linda exerted undue influence on Margie with respect to the making of Margie's June 2004 will.[8] *See Rothermel,* 369 S.W.2d at 922; *Cotten*, 169 S.W.3d at 827. Accordingly, the trial court did not err in rendering judgment notwithstanding the verdict. *See Tanner*, 289 S.W.3d at 830. Elizabeth's first issue is overruled.

**B.     Admission of Exhibits**

By her second issue, Elizabeth contends that the trial court erred by excluding certain exhibits, including correspondence between Margie, Willard, Elizabeth, and Helen between 1993 and 2001. Elizabeth argues that this evidence "demonstrated the depth of affection Margie felt for Elizabeth Stadele and her family in the years before Margie's isolation." We review a trial court's decision to admit or exclude evidence for abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). Even if the trial court abused its discretion, we may only reverse the judgment on that basis if the error probably caused the rendition of an improper judgment or probably prevented Elizabeth from properly presenting her appeal. TEX. R. APP. P. 44.1(a).

---

[8] In light of this conclusion, we need not address the second and third elements of undue influence—i.e., whether the influence subverted the will or overpowered the mind of the testator, and whether the testator would not have executed the instrument but for the influence. *See* TEX. R. APP. P. 47.1; *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *see also Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam) (noting that a no-evidence challenge will be sustained if there is no evidence of at least one essential element of the plaintiff's claim).

14

Assuming, without deciding, that the trial court erred by excluding these exhibits, we cannot conclude that their exclusion probably resulted in an improper judgment or prevented Elizabeth from properly presenting her appeal to this Court. *See id.* The excluded exhibits are all relevant to the nature and extent of the relationships between Margie and Elizabeth's family between 1993 and 2001. However, as we have noted, there appears to be no dispute that Elizabeth's family enjoyed cordial relations with Margie up until at least Thanksgiving of 2003. Accordingly, even if the exhibits were admitted and considered by the trial court in evaluating the motions for judgment notwithstanding the verdict, the outcome of the proceeding would not have been different.

We overrule Elizabeth's second issue.[9]

### III. Conclusion

The judgment of the trial court is affirmed.

DORI CONTRERAS GARZA
Justice

Delivered and filed the
2nd day of August, 2012.

---

[9] Wells Fargo raises a "cross-point" in which it argues that, in the event we found legally sufficient evidence to support the jury's verdict, the evidence was nonetheless factually insufficient to support the verdict and so the cause should be remanded for a new trial. We have jurisdiction over this "cross-point" because, even though Wells Fargo did not file a notice of appeal, it does not ask for more favorable relief than granted to it by the trial court. *See* TEX. R. APP. P. 25.1(b) ("The filing of a notice of appeal by any party invokes the appellate court's jurisdiction over all parties to the trial court's judgment or order appealed from."); TEX. R. APP. P. 25.1(c) ("The appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause."). However, the issue is moot because we have determined that the trial court's judgment notwithstanding the verdict was not erroneous. *See* TEX. R. APP. P. 47.1.